STATE OF NORTH CAROLINA v. ALBERT LEWIS CAREY, JR.

No. 82

(Filed 7 October 1975)

1. **Criminal Law § 57— size of lead pellets — qualification of expert**

   The trial court properly allowed a State's witness to give his opinion that lead pellets removed from a homicide victim's body were No. 6 buckshot where the evidence showed that the witness, through both study and experience, had acquired the requisite skill to give his opinion as to the size of the lead pellets, although the witness had been tendered as an expert in firearms identification and not as an expert in ballistics.

2. **Criminal Law § 62— testimony officer assigned to polygraph unit**

   In this prosecution for homicide and conspiracy to commit armed robbery, defendant was not prejudiced by a police officer's testimony that he was then assigned to the polygraph unit since the jury heard no testimony as to the results of a polygraph test.

3. **Criminal Law § 75— admissibility of confession — misinformation as to punishment — statements concerning polygraph**

   There is no merit in defendant's contention that his confession was involuntary and inadmissible on grounds that he was misinformed as to the severity of punishment for the charges against him (i.e., imprisonment as opposed to death), and that he was told that a polygraph test (which was not completed) would be for his own benefit and the benefit of the police department and that nothing elicited during the polygraph test would be used in evidence against him, where

254

State v. Carey

defendant did not contend that he confessed because police were using the threat of a polygraph test to force incriminating admissions from him or that his confession was based on any improper inducement generating a hope that he might thereby obtain relief from the charges to which the confession related.

**4. Criminal Law § 34— evidence of other crimes**

In a prosecution for a particular crime, evidence of other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged, but if such evidence tends to prove any other relevant fact, it will not be excluded merely because it also shows defendant to have been guilty of an independent crime.

**5. Criminal Law § 34— evidence of other crimes — competency to show common plan**

In a prosecution for murder committed during an attempted armed robbery and conspiracy to commit armed robbery, the trial court did not err in the admission of testimony by a police officer that defendant had placed a check mark and his initials beside certain armed robberies, including the one in question, on a list presented to him since (1) this evidence tended to prove the relevant fact that he had admitted participating in the robbery in question, and (2) defendant made no objection to the testimony.

**6. Criminal Law § 88— right of cross-examination — polygraph evidence — opening door for evidence by State**

Defendant was not deprived of the right effectively to cross-examine an officer concerning the circumstances surrounding defendant's confession by the court's ruling that if defendant brought out evidence concerning a polygraph examination, the State would be allowed to bring out all the circumstances regarding the polygraph examination on redirect.

**7. Homicide § 2— murder during perpetration of conspiracy — guilt of conspirators**

When a conspiracy is formed to commit a robbery or burglary, and a murder is committed by any one of the conspirators in the attempted perpetration of the crime, each and all of the conspirators are guilty of murder in the first degree.

**8. Homicide § 4— dismissal of felony charge — conviction of felony-murder**

Where the theory of the State's case in a first degree murder prosecution was that defendant and others had conspired to commit the felony of armed robbery of a service station and that one of the conspirators shot and killed a service station attendant during the attempted robbery, defendant could be convicted of a felony-murder notwithstanding a charge against defendant for the felony of armed robbery had been dismissed in a previous trial.

**9. Conspiracy § 8; Criminal Law § 26; Homicide § 31— conspiracy to rob — felony-murder — conviction of both**

A defendant can properly be convicted of both first degree murder committed in the perpetration of an armed robbery and conspiracy to commit the armed robbery since the conspiracy is a completed crime

State v. Carey

when it is formed and does not merge into the offense of first degree murder.

10. **Criminal Law §§ 34, 89; Husband and Wife § 6— prior inconsistent statements of defendant's wife — unrelated crimes by defendant**

In this prosecution for murder committed during perpetration of an armed robbery and conspiracy to commit armed robbery, the trial court properly allowed the State to cross-examine defendant's wife about prior inconsistent statements tending to show that she knew the "trigger man" in the killing prior to the date of the offenses and to introduce the statements into evidence for the purpose of impeachment; even if these statements tended to implicate defendant in other unrelated crimes, they were competent as tending to establish a common plan or scheme embracing the commission of a series of crimes so related to each other that proof of one or more tends to prove the commission of the crimes charged and to connect defendant with their commission. G.S. 8-57.

11. **Criminal Law § 102— fair trial — facial expressions of district attorney**

Defendant will not be deemed to have been denied a fair trial because of alleged facial expressions of the district attorney in response to testimony by defendant's wife where there is nothing in the record to show what the facial expressions were.

12. **Criminal Law § 102— jury argument by district attorney — reasonable comment on evidence**

The district attorney's statement in his jury argument that defendant was shown a list of armed robberies and told to check and initial those in which he was involved "and that one was checked" was a reasonable comment on the evidence and did not deny defendant a fair trial.

13. **Criminal Law § 102— jury argument of district attorney — fair comment on evidence**

In this prosecution for murder committed in perpetration of armed robbery and conspiracy to commit armed robbery, defendant was not denied a fair trial by the district attorney's jury argument that the "trigger man" was only fifteen years old and defendant was twenty-three, and that it was not justice for a fifteen year old boy to carry the burden alone for the murder, that the responsibility for the crime lay on the shoulders of defendant, and that a man was killed as a result of the planning of defendant, since the argument was legitimate under the evidence presented in the case.

14. **Constitutional Law § 36— death penalty for first degree murder**

The death penalty was constitutionally imposed for first degree murder.

Justice LAKE concurs in result.

Chief Justice SHARP dissenting.

Justice BRANCH concurs in the dissenting opinion.

Chief Justice SHARP and Justices COPELAND and EXUM dissent as to death sentence.

State v. Carey

APPEAL by defendant from *Snepp, J.,* at the 16 December 1974 Regular "C" Session of the Superior Court of MECKLEN-BURG. This case was docketed and argued at the 1975 Spring Term as No. 67.

Defendant was convicted of two charges upon two separate bills of indictment which were consolidated for trial. In one indictment, drawn under G.S. 15-144, defendant was charged with the murder of James D. Sloop, Sr. on 19 June 1973. Upon this charge the jury returned a verdict of "Guilty of Murder in the first degree." From the mandatory sentence of death imposed upon the verdict defendant appealed directly to this Court pursuant to G.S. 7A-27(a). In the second indictment it was charged that on 19 June 1973 defendant feloniously conspired with James Calvin Mitchell, Anthony Carey and others to attempt to commit the crime of armed robbery (G.S. 14-87) by attempting to steal, take and carry away money from the person of James Sloop by the use of a shotgun whereby Sloop's life was endangered and threatened. Upon this charge the jury returned a verdict of "guilty of felonious conspiracy." The judge imposed a sentence of ten years, and defendant appealed to the Court of Appeals. Upon defendant's motion this conviction was certified for initial appellate review by the Supreme Court pursuant to G.S. 7A-31(a).

Defendant was convicted of these same charges at his first trial before Judge Sam J. Ervin III at the 26 November 1973 Session of Mecklenburg County Superior Court. On appeal from these first convictions, this Court, in an opinion by Justice Lake, awarded defendant a new trial for failure of the trial judge to permit defendant to interrogate prospective jurors concerning their views with reference to the imposition of the death penalty and for failure to permit defendant to inform the jury, during final arguments, that under the law of this State, the prescribed punishment for first-degree murder is death. *See State v. Carey,* 285 N.C. 509, 206 S.E. 2d 222 (1974).

The theory of the State's case (at both trials) was that defendant (known as "Butch"), his younger brother (Anthony Douglas Carey), James Calvin Mitchell (known as "Peanut"), Harold Givens and Antonio Dorsey together planned and conspired to rob with firearms the operators of an Exxon service station located at the intersection of West Trade and Cedar Streets in Charlotte, North Carolina. During the course of the attempted armed robbery on 19 June 1973, James D. Sloop, Sr.,

who was assisting Mr. Freeman B. Williams (owner) in the operation of the station, was shot in the abdomen with a sawed-off shotgun. Mr. Sloop died on 3 July 1973 from an infection of his digestive organs, which was caused by the wound inflicted on 19 June. James Calvin "Peanut" Mitchell (hereinafter sometimes referred to as Mitchell) fired the fatal shot. After the shotgun was discharged, Mitchell fled the scene without getting any money or anything else.

All five of the aforementioned individuals were originally charged with conspiracy to commit this offense. Mitchell, who was fifteen-years-old at the time of the incident, was allowed to plead guilty to second-degree murder in exchange for his testimony against his alleged co-conspirators.

Defendant's brother, Anthony Douglas Carey, was the first of these co-defendants to go to trial. He was convicted of conspiracy to commit armed robbery and of first-degree murder before Judge Sam J. Ervin III at the 29 October 1973 Regular "A" Session of Mecklenburg County Superior Court. Mitchell testified for the State at this trial and his testimony, was to the effect that he, defendant, defendant's brother, Harold Givens and Antonio Dorsey planned to rob the Exxon service station located on West Trade and Cedar Streets; that defendant supplied him with a sawed-off shotgun and transported him to the vicinity of the station in his automobile; that he and Givens went to the service station with the intent to rob it; that he shot James D. Sloop, Sr., with the sawed-off shotgun; and that he and Givens then ran back to the automobile driven by defendant and were transported away from the scene. On appeal from these convictions, this Court, in an opinion by Justice Huskins, granted defendant's brother a new trial. See 285 N.C. 497, 206 S.E. 2d 213 (1974).

The next co-defendant to come to trial was Harold N. Givens. At this trial Mitchell again testified for the State. However, this time Mitchell's testimony was to the effect that he had taken no part in the armed robbery and that he was at home at the time it occurred. At the close of the State's evidence, defendant Givens' motion for judgment as in the case of nonsuit was granted.

Defendant was the third of these co-defendants to come to trial (first trial before Ervin, J.). Mitchell once again testified for the State. This time Mitchell testified that he, defendant, defendant's brother and Antonio Dorsey planned the service sta-

tion robbery prior to the date it was attempted; that he was in the company of defendant and defendant's brother on the 18th of June from late morning until approximately 6:00 p.m.; that he met defendant and defendant's brother between 4:00 and 5:00 p.m. on 19 June 1973 and rode around with them for about two hours, passing the Exxon station five or six times; and that he had originally been charged with first-degree murder, but had pled guilty to second-degree murder and had not been sentenced. See *State v. Carey, supra.*

Subsequent to the above proceedings, the State elected to drop the charges against defendant's brother and against the co-defendant Dorsey. As previously noted, co-defendant Givens had the charges against him nonsuited.

At defendant's second trial before Judge Snepp, the State's evidence, summarized except where quoted, tended to show the following:

Freeman B. Williams testified that on 19 June 1973 he was the owner and the operator of the Exxon service station at the corner of West Trade and Cedar Streets, Charlotte, North Carolina. Williams further testified that on the evening of 19 June, at approximately 7:00 p.m., he and his employee, James D. Sloop, Sr., were in the process of closing the station when two boys came around the Cedar Street side of the station. One of the boys was carrying a sawed-off shotgun. One of the boys, he did not know which one, said "Gimmee," and Mr. Sloop spoke up and said, "Oh boy, I wouldn't give you anything." When Mr. Sloop made the above statement, the boy with the shotgun "just whirled around like that and shot him . . . right in the stomach. His intestines just dropped down, and, of course, they ran, the two boys. They ran back around the way they came . . . behind the station on the Cedar Street side." Williams positively identified Mitchell, who was present in the courtroom, as the boy who fired the fatal shot. Williams further testified that defendant was not the "other boy" with Mitchell.

Patrol Officer B. B. Davis testified that on 19 June 1973 he was operating a mobile unit in uptown Charlotte when he received a call at approximately 7:00 p.m. and proceeded to Williams' Exxon station. When he arrived, he jumped out of the squad car and ran inside the office portion of the station. Mr. Sloop was standing inside the office, about three feet from the door. "He was standing there with his hands clasped together under his stomach and his stomach was slit open and his intes-

tines were hanging out in his hands." Patrolman Davis told Sloop to sit down, that an ambulance was en route. Sloop responded: "It's too late, I'm dying."

James Calvin "Peanut" Mitchell was called by the State and he testified that he was seventeen-years-old and was then incarcerated in the Mecklenburg County jail. He stated that he was serving a forty year sentence "for murder and armed robbery" (he had apparently been sentenced sometime subsequent to defendant's first trial).

As to the events of 19 June 1973, Mitchell testified as follows:

"On June 19, 1973, I was fifteen years old, I don't remember what time it was, but remember going to the Exxon Station at West Trade Street here in Charlotte. When I got there, I went up there and told the man to freeze and give me all he had. Then he went for a gun and I shot him. After I shot him I went across the fence and ran. I ran down by Irwin Avenue and on across Seaboard Street through the Fairview Homes. From Irwin Avenue up the path there to Seaboard Street and then on to Fairview Homes.

"After then, I messed around up there on Oaklawn Playground and then went home.

"Q. Was anybody with you at the time?

"A. Nope.

"Q. How did you get to the Exxon Service Station?

"A. How did I get to the Exxon Service Station?

"Q. Yes.

"A. I walked.

"Q. Did anybody go with you?

"A. No, didn't nobody go with me. It was a guy who was down at Irwin Avenue playing basketball. So I told him to go to the service station with me to get a drink. He went up there. So when I pulled the gun on the man, he throwed the drink down and ran."

At this point, the State moved the court to declare the witness Mitchell "hostile." The trial judge excused the jury and conducted a *voir dire* hearing, and after finding facts and con-

State v. Carey

cluding that Mitchell was in fact hostile, permitted the State to ask him leading questions during the remainder of the direct examination. After reading a portion of his testimony at defendant's first trial, Mitchell admitted the authenticity of the questions and answers then propounded and given, but denied the truthfulness of all of his responses.

Lieutenant Detective Wade Stroud testified that in July of 1973 he was commander of the "Task Force," a uniformed division of the Charlotte Police Department normally given special assignments. He stated that at approximately 1:00 a.m. on 10 July 1973 he went to 305 Oregon Street, Charlotte, North Carolina, in order to serve arrest warrants on defendant and defendant's brother. He found both of these individuals asleep in an upstairs bedroom. After defendant and his brother had been placed under arrest, Stroud walked back downstairs looking for another person that he had a warrant for. As he entered the kitchen area, he observed, to the left of the stove, a partially opened drawer that contained a box of approximately thirteen .20 gauge 3-inch magnum shotgun shells. Stroud seized the box. The box and the shells were introduced into evidence by the State.

B. J. Sloan, a firearm examiner of the Crime Laboratory of the Charlotte Police Department, testified that his duties included the examination of weapons to determine if they were in good mechanical condition; the examination of bullets and cartridge cases to determine if they came from a particular weapon; the examination of ammunition to determine the caliber; the examination of weapons to determine the caliber and gauge; and the examination of shotgun shells and shotgun shell components to determine size and make.

Over defendant's objection, the State tendered the witness Sloan as an expert, qualified to testify in the field of firearms identification. After defendant's objection was overruled, Sloan testified that based on his examination of the four lead shot pellets removed from the body of James D. Sloop, Sr., during an autopsy, he had concluded that they were No. 6 buckshot.

On cross-examination, Sloan testified that he had not examined any of the shot contained in the box of shotgun shells seized by Detective Stroud at defendant's apartment and therefore did not know if this shot was No. 6 or not.

W. O. Holmberg took the stand and testified that he was assigned to the polygraph unit of the Charlotte Police Depart-

ment. At this point, defendant's counsel asked the court to excuse the jury so he could "address some remarks to the court." After the jurors left the courtroom, defendant's counsel told the court that the district attorney had been requested at the pre-trial conference not to bring out any evidence "concerning the polygraph examination." The court stated this fact was irrelevant and thereafter denied defendant's motion to strike the answer.

Thereafter, Officer Holmberg testified that on the morning of 11 July 1973 he had occasion to see defendant in the polygraph room, located on the fourth floor of the Law Enforcement Center. Before Holmberg could testify as to an incriminating statement and admission made by defendant at that time, defendant's counsel objected and moved to suppress such evidence. The trial judge conducted a *voir dire* hearing, and after finding the facts, concluded that the evidence was admissible. The exact nature of this evidence and its admission into evidence will be more fully considered in the opinion.

Following the *voir dire* hearing, Detective R. J. Whiteside testified that on 11 July 1973 he checked defendant out of the Mecklenburg County jail and escorted him back to the Law Enforcement Center. Detective W. D. Starnes was with Whiteside at this time. After they had entered a conference room in the Criminal Investigation Bureau, defendant was given the Miranda warnings and a standard waiver of rights form. It was read to him and he signed it. Defendant told the detectives that he understood his rights. Thereafter, defendant was questioned with regard to the Sloop shooting at the Exxon station. Defendant denied any knowledge of the incident. Defendant was thereafter taken to the fourth floor and turned over to Officer Holmberg. Detectives Whiteside and Starnes then entered an "observation room" adjacent to Holmberg's office where they could see defendant and Holmberg through a two-way mirror and could hear what they said through a PA system setup.

At this point, W. O. Holmberg was recalled and testified that after defendant was brought into his office (the polygraph room) at approximately 9:00 a.m. on 11 July 1973 he stated that he, Givens and Mitchell had planned the robbery of Williams' Exxon on the night prior to the incident; that on the date of the incident he had his wife's automobile; that had driven Givens and Mitchell to the intersection of Trade and Clarkson Streets and had there let both of them out of the car with the under-

State v. Carey

standing that they were going to rob Williams' Exxon service station.

After defendant had made the above recited statement, Holmberg testified that he left the polygraph room and asked Detectives Whiteside and Starnes for a list of alleged armed robberies that had been committed in the Charlotte area. Holmberg stated that he took this list with him back into his office (polygraph room) and placed it in front of defendant. He then asked defendant to put a check mark, along with his initials, beside any of the robberies that he had been involved in. Holmberg stated that defendant looked at the list and made "several check marks and initials behind each check mark." At this point, the State introduced an exhibit showing only defendant's marks beside the robbery at Williams' Exxon on 19 June 1973. More detailed examination of the events surrounding this incident will be considered in the opinion.

Detective R. J. Whiteside was recalled and testified that he had been in a position to hear and to see the conversation that Officer Holmberg had just testified to. Whiteside testified that defendant told Holmberg "that he was involved in this matter to the extent of taking these persons to the Exxon Station in his automobile and letting them out, and knew they were going to rob Sloop."

At this time, the State rested its case.

Defendant's evidence, summarized except where quoted, tended to show the following:

Defendant took the stand and testified that he did not know James Calvin "Peanut" Mitchell prior to being arrested on these charges. Defendant further testified that:

> "I did not take part in or help plan any robbery of the Exxon Station. I did not take Mitchell and somebody named Givens to the corner of Clarkson Street or Cedar and Trade. I did not kill James Sloop and I did not help plan the robbery at all. The shotgun shells that Officer Stroud says he found are not mine. I did not buy them and I did not know anything about them being in that house at all."

At the time of the incident, defendant stated that he was at his father-in-law's residence, which was located approximately one block from the Exxon station. Defendant's contentions regarding the alleged statement and checking on the list of robberies will be considered in the opinion.

On cross-examination defendant reasserted that he did not know a James Calvin "Peanut" Mitchell at any time prior to 19 June 1973, the date of the robbery. He denied ever going over to Mitchell's house and picking him up at any time for the purpose of committing robberies or for any other purpose.

Pamela Carey, defendant's wife, testified and more or less corroborated defendant's contentions regarding his defense of alibi.

On cross-examination, Pamela testified that the first time she met "Peanut" Mitchell was when she and her mother went to the Mecklenburg County jail on 10 July 1973. She stated that she had never met Mitchell before that time. At this point, the district attorney commenced to "sift" the witness concerning two prior inconsistent statements she had given Detective H. R. Thompson on 10 July 1973. Both statements indicated that Pamela had known Mitchell prior to 19 June 1973 and that Mitchell and her husband had committed several armed robberies in the Charlotte area. Pamela read these documents and admitted that she had "signed" them both, but denied having made any of the statements contained therein. After further cross-examination, defendant's attorney objected to this particular line of questioning. At this point, the trial judge excused the jury and heard arguments by counsel, after which he indicated that he would let the State introduce into evidence Pamela's two inconsistent prior statements on the theory that whether or not she knew Mitchell was not a collateral matter (see Detective Thompson's testimony below). The contents of both statements and their admission into evidence will be more fully considered in the opinion.

At this point, with the State's consent, the testimony of Charles Glenn, given at defendant's first trial, was read to the jury. Glenn, who was defendant's father-in-law, testified that he and defendant were drinking beer and playing cards at his home at the time of the robbery.

Defendant then rested his case.

As rebuttal evidence, the State first called Eleanor C. Mitchell, who was James Calvin "Peanut" Mitchell's mother. She testified that she knew defendant during June of 1973; that she had seen him at her home; that he and his wife and a "couple of other fellows" would come by her house and pick up her son

from time to time; and that prior to 9 July 1973 defendant had come by her home approximately twelve times.

The State also called Detective H. R. Thompson as a rebuttal witness. Thompson testified that during June and July of 1973 he had participated in the investigation of the Williams' Exxon station robbery and that as part of that investigation he had an opportunity to meet one Pamela Carey. Thompson further testified, over objection, that on 10 July 1973, after informing Pamela of her Miranda rights and having her execute the standard waiver form, she made two statements regarding various armed robberies that her husband and Mitchell had participated in. After Thompson identified State's Exhibits 11, 12 and 13 as the waiver form and statements, these documents were introduced into evidence and submitted to the jury for their examination.

Other pertinent facts and evidence will be discussed in the opinion.

*Attorney General Rufus L. Edmisten by Assistant Attorney General John R. B. Matthis for the State.*

*John H. Hasty for defendant appellant.*

COPELAND, Justice.

[1]   Defendant first assigns error to the action of the trial court in ruling that the State's witness, B. J. Sloan, was an expert in the field of firearms identification, and in permitting the witness to testify that based on his examination of the four lead pellets removed from the body of James D. Sloop, Sr., he concluded that they were No. 6 buckshot. Defendant argues that since the witness was tendered as an expert in the field of "firearms identification," he was not qualified to testify in the field of ballistics. This assignment is without merit.

The qualification of an expert is ordinarily addressed to the sound discretion of the trial court and "[t]he court's findings that a witness is qualified as an expert will not be disturbed on appeal if there is evidence to show that, through study or experience, or both, he has acquired such skill that he is better qualified than the jury to form an opinion on the particular subject as to which he testifies." *See generally* 1 Stansbury, N. C. Evidence § 133 (Brandis Rev. 1973) ; 2 Strong, N. C. Index 2d, Criminal Law § 51 (1967). The evidence in the instant case clearly indicates that the witness Sloan, through both study and

experience, had acquired the requisite skill to give his opinion as to the size of the lead pellets taken from the decedent's body. In *State v. Jenerett,* 281 N.C. 81, 90, 187 S.E. 2d 735 (1972), the defendant contended that the trial court erred in allowing a police officer, over the defendant's objection, to give an opinion as to the caliber of the bullet taken from the body of the deceased. In rejecting this contention, this Court, in an opinion by Justice Moore, stated:

> "While the trial court did not expressly find the witness to be an expert in ballistics, the court did allow him to give his opinion as to the caliber of the bullet. By admitting the testimony as to the caliber of the bullet, the court presumably found him to be an expert. There was ample evidence to support such finding. [Citations omitted.]"

Even assuming, *arguendo,* that the admission of this testimony was error, it was clearly harmless since the witness Sloan testified on cross-examination that he had not compared any of the shot contained in the box of shotgun shells seized at defendant's residence with the shot taken from the decedent's body. This assignment is therefore overruled.

Defendant next assigns as error the overruling of his objection to the admission into evidence of his alleged statement given to Officer Holmberg and overheard by Officer Whiteside. The evidence indicated that Officer Starnes was in a position where he may have heard the statement, but he did not testify. Defendant also contends that the trial court committed prejudicial error by allowing the State to elicit on direct examination of Officer Holmberg the fact that he was assigned to the polygraph unit. Defendant has grouped these two arguments together. We will do likewise.

[2]  When Officer Holmberg initially took the stand he testified that he had been employed by the Charlotte Police Department for twenty-three years and that he was presently assigned to the polygraph unit. At this point, defendant's counsel asked the court to excuse the jury and thereafter told the court that the solicitor had been requested at the pretrial conference not to bring out any evidence "concerning the polygraph examination." The court stated it was irrelevant and overruled defendant's objection and denied his motion to strike.

Defendant relies on *State v. Foye,* 254 N.C. 704, 120 S.E. 2d 169 (1961), where this Court, in an opinion by Chief Justice Winborne, held that the *results* of a polygraph test are not ad-

missible to establish the guilt or the innocence of one accused of a crime. The Court went on to state that: "Moreover, the parties should not be permitted to introduce lie detector results into evidence by indirection. [Citations omitted.]" *Id.* at 709, 120 S.E. 2d at 172. Defendant's reliance on *Foye* is misplaced. In *State v. Williams,* 279 N.C. 515, 184 S.E. 2d 282 (1971), this Court, in an opinion by Justice Lake, held that, under the circumstances there presented, there was no prejudicial error from testimony that the defendant had agreed to take and took a polygraph test, since "[t]here was no evidence, before the jury, as to the nature of the test, the questions propounded, the answers given, or the results of the test." *Id.* at 524, 184 S.E. 2d at 288. In the instant case, as in *Williams,* the jury never heard any testimony as to the results of a polygraph test. In fact, defendant was not administered a complete polygraph examination and there were no results for the jurors to hear. This portion of the assignment is therefore overruled.

[3]　It is also defendant's contention that any alleged statement given by defendant to Officer Holmberg should be inadmissible because (i) the statement was not freely and voluntarily given; and (ii) the statement was induced by misrepresentations concerning the ultimate use of the polygraph examination. Defendant brought forward a similar objection to the introduction of this statement on the prior appeal. See 285 N.C. 509, 206 S.E. 2d 222 (1974). In that case, this Court, after carefully reviewing all the evidence presented on *voir dire,* as well as the Court's findings of fact and conclusions of law, found no error in the ruling permitting the police officers to testify as to the statement made to them by defendant. *Id.* at 516-17, 206 S.E. 2d at 227. The evidence at the second trial on this subject is substantially the same as that produced at the first.

　　In his brief, defendant concedes that the prior appeal constitutes the "law of the case" as to this issue but specifically asks that we reconsider the question in the light of *State v. Pruitt,* 286 N.C. 442, 212 S.E. 2d 92 (1975). In *Pruitt,* this Court, in an opinion by Justice Branch, held that the defendant's confession was not properly admissible in evidence since it was obtained "by the influence of hope or fear implanted in defendant's mind by the acts and statements of the police officers during defendant's custodial interrogation." *Id.* at 455, 212 S.E. 2d at 100. The *Pruitt* decision was not grounded on the failure of the police to comply with the procedural safeguards enunciated by the United States Supreme Court in *Miranda v. Arizona,* 384

U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), but on the fact that the confession was not "voluntarily and understandingly made." *Id.* at 454, 212 S.E. 2d at 100. This has been the ultimate test as to the admissibility of confessions in this State since *State v. Roberts,* 12 N.C. 259 (1827).

Defendant contends that both *Pruitt* and *Roberts* render his confession inadmissible. In support of this contention, defendant asserts that he was misinformed as to the severity of the punishment for the charges against him (i.e., imprisonment as opposed to death) ; that he was told that the polygraph examination would be for his own benefit and for the benefit of the Charlotte Police Department; and that nothing elicited during the polygraph examination would be used in evidence against him.

Under the facts disclosed in this record, we find no merit in defendant's contentions. Defendant does not contend that he made the alleged statement to Officer Holmberg because the police were using the threat of a polygraph examination as a tool to force incriminatory admissions from him. Furthermore, defendant does not assert that he made the statement based on any improper inducement generating a hope that by doing so he might obtain relief from the criminal charges to which the confession related. *See State v. Pruitt, supra,* 286 N.C. at 458, 212 S.E. 2d at 102-103. *See also, State v. Thompson,* 287 N.C. 303, 214 S.E. 2d 742 (1975). On the contrary, defendant affirmatively testified on direct examination that he did not make *any* incriminatory statement of any nature to Officer Holmberg or to any other officer on 11 July 1973, or at any other time. Under these facts, we cannot say that the statement and admission obtained from defendant were made under the influence of fear or hope, or both, growing out of language or acts of those who held him in custody. The admissibility of this evidence was for the trial judge. Based on the evidence produced on *voir dire,* the trial judge found facts and made conclusions of law to the effect that defendant freely and voluntarily made the statement and admission as the State contended. There was ample evidence to support the trial judge's findings, and those findings in turn support the trial judge's conclusions that defendant freely, understandingly, voluntarily, and intelligently made a statement and admission to Officer Holmberg on 11 July 1973, without undue influence coercion or duress, and without any promise, threat, reward, or hope of reward; that he had been fully advised of his constitutional rights and understood those rights; and that after being advised on these rights, he knowingly and

intelligently waived his right to the presence of counsel at the time he made the inculpatory statement and admission. *See State v. Thompson, supra,* 287 N.C. at 318, 214 S.E. 2d at 755. *See also State v. Young,* 287 N.C. 377, 214 S.E. 2d 763 (1975); *State v. Simmons,* 286 N.C. 681, 213 S.E. 2d 280 (1975); *State v. Pruitt, supra; State v. Thompson,* 285 N.C. 181, 203 S.E. 2d 781, *cert. denied,* 419 U.S. 867 (1974). Thus, we adhere to our former opinion holding this evidence admissible. This assignment is overruled.

Defendant next contends that the trial court committed prejudicial error in allowing the State to introduce into evidence Exhibit 8-A, which was an excerpt from a list of armed robberies that included the attempted robbery of Williams' Exxon service station at Trade and Cedar Streets in Charlotte. Prior to its introduction into evidence, the court conducted a *voir dire* hearing and held that "the list may be received into evidence" provided that "all other parts of the document (other than the robbery at Williams' Exxon) shall be eliminated from the exhibit . . . so that the jury will see only that portion relating to the Sloop Exxon Station matter."

[4] The general rule in North Carolina is that in a prosecution for a particular crime, evidence of other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged. *See, e.g., State v. Watson,* 287 N.C. 147, 214 S.E. 2d 85 (1975); *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481 (1969); *State v. Fowler,* 230 N.C. 470, 53 S.E. 2d 853 (1949). *See generally* E. Cleary, McCormick on Evidence, 444-454 (1972); 1 Stansbury, N. C. Evidence, § 91 (Brandis Rev. 1973); 2 Strong, N. C. Index 2d, Criminal Law § 34 (1967). But, if the evidence of other offenses tends to prove any other relevant fact, it will not be excluded merely because it also shows the defendant to have been guilty of an independent crime. *See, e.g., State v. Grace,* 287 N.C. 243, 213 S.E. 2d 717 (1975). *See generally* 1 Stansbury, *supra,* at § 91, and authorities there cited; 2 Strong, *supra,* at § 34.

[5] The evidence complained of under this exception does not appear to be State's Exhibit 8-A, which was shown to the jury, and on which defendant had placed his check mark and initials beside a reference to the attempted armed robbery and murder at Williams' Exxon. On the contrary, defendant's exception appears to be directed to the testimony of the police officers pre-

ceding the introduction of State's Exhibit 8-A that tended to show defendant had placed a check mark and his initials beside other armed robberies on the list presented to him. Accordingly, defendant concludes that it made no difference that the other entries on the list had been deleted when State's Exhibit No. 8-A was introduced.

It is true that preliminary questioning showed defendant looked at a list and made several check marks and initials beside several armed robberies noted thereon. But, for the following reasons, we find no prejudicial error in the admission of this testimony.

First, it could be argued that since this evidence tended to prove another relevant fact, i.e., that defendant had admitted participating in the attempted robbery of Williams' Exxon, it was not excludable merely because it also showed defendant to have participated in other unspecified armed robberies in the Charlotte area. More importantly, when Officer Holmberg testified about a list of armed robberies presented to defendant, on which defendant made "several check marks," defendant made no objection. The North Carolina law on the failure to object in this situation is as follows: "The well established rule [is] that when incompetent evidence is admitted over objection, but the same evidence has theretofore or thereafter been admitted without objection, the benefit of the objection is ordinarily lost . . . . " *State v. Godwin*, 224 N.C. 846, 847, 32 S.E. 2d 609, 610 (1945). *Accord, e.g., State v. Grace, supra; State v. Stegmann*, 286 N.C. 638, 653, 213 S.E. 2d 262 (1975) ; *State v. Jenerett, supra; State v. Little*, 278 N.C. 484, 180 S.E. 2d 17; (1971) ; *State v. Owens*, 277 N.C. 697, 178 S.E. 2d 442 (1971) ; *State v. Perry*, 275 N.C. 565, 169 S.E. 2d 839 (1969). Accordingly, even if the evidence of the other crimes was incorrectly admitted, its admission was rendered harmless by its prior admission without objection.

**[6]** Defendant next contends that the trial court committed prejudicial error in limiting defendant's right to cross-examine the witness W. O. Holmberg.

The question involved is intertwined with the admissibility of defendant's inculpatory statement. Defendant contends that he was faced with a choice of either letting the alleged statement go into evidence unchallenged or of examining Officer Holmberg concerning the circumstances surrounding the alleged statement and thereby bringing out further evidence concerning the polygraph examination. Accordingly, defendant concludes

he was "boxed in" and such a choice deprived him of the right to effectively cross-examine Holmberg concerning the circumstances under which defendant's statement was made.

While defendant's counsel was cross-examining Officer Holmberg, he asked the court to provide him with further instructions as to questions regarding the polygraph examination. The trial judge excused the jury and the following exchange occurred:

"MR. HASTY: All right. If it please the Court, so that I will understand, now am I to take it that you do not want me to ask Mr. Holmberg—

"COURT: I don't care what you ask Mr. Holmberg.

"MR. HASTY: I understand.

"COURT: But my point is, you were in chambers very emphatic that you didn't want this about the polygraph to come out. Now, if you're going to ask Mr. Holmberg what he told him the day before, I'm going to let him tell them everything he told him the day before because it's not fair to let you have your cake and eat it, too.

"MR. HASTY: Well, sir, I, of course, realize that I could open the door, as they say, but I don't believe I would do that unless I specifically asked him about any test.

"COURT: No, sir. When you start saying what he told him the day before, then the State is entitled to have the whole thing spread on it.

"MR. HASTY: Then I take it that you would rule the same way if I were to ask him if he told him that it would be to his benefit to take the examination.

"COURT: The polygraph test, and you would have opened it up.

"MR. HASTY: All right sir.

"COURT: Now, you can't put in half about the polygraph test. If you don't want it before the jury, why that's a decision you will have to make.

"MR. HASTY: That's the exact argument I made to the Supreme Court, and that is, of course, what the Supreme Court is letting the State do, get in half of it, and I, of

course, am saddled with that decision. I realize that. All right, sir.

"Court: And you're asking him if he told him something about the polygraph test, and wanting the jury to infer he's telling him about this statement. Now, that I can't permit.

"Mr. Hasty: Well, yes, sir.

"Court: He is going to have to explain what he said to him was about a polygraph test. Now, this is where we come to.

"Mr. Hasty: Of course, the State is doing the exact opposite thing, letting the jury infer that this was a statement given without fear of a polygraph, which is, of course, not true. I will, of course, abide by your feelings.

"Court: I am just telling you what is going to happen. If you don't, I'm going to let the State bring it all in.

"Mr. Hasty: I just wanted to see where the perimeters were."

In his brief, defendant's argument is as follows: (1) *State v. Foye, supra, State v. Williams, supra,* hold that the *results* of a polygraph test cannot be either directly or indirectly introduced into evidence; (2) in order for defendant to effectively cross-examine Holmberg as to the circumstances surrounding the alleged confession, it was necessary to elicit testimony pertaining to the polygraph test, which the aforementioned rule does not permit; (3) therefore, defendant has been deprived of his absolute right of cross-examination.

Defendant's argument is faulty in two respects. First, the evidence defendant refers to was not the *result* of any polygraph test and it was not elicited during the course of a polygraph examination. Hence, neither *Foye* nor *Williams* is directly applicable. Second, the trial judge, in answer to a question by the defense as to the scope of permissible cross-examination, stated that he did not care what defendant's counsel asked Holmberg. However, the court also noted that if defendant "opened the door" as to the polygraph issue, then he would permit the State to bring out all the circumstances regarding the polygraph examination on redirect. Defendant's argument falls of its own

weight and does not support his contention that he was deprived of his absolute right to cross-examination.

" 'One of the most jealously guarded rights in the administration of justice is that of cross-examining an adversary's witnesses.' " *Barnes v. Highway Commission,* 250 N.C. 378, 394, 109 S.E. 2d 219, 232 (1959), *quoting from* 1 Stansbury, N. C. Evidence, § 35 (Brandis Rev. 1973). *See generally* E. Cleary, McCormick on Evidence § 19 (2d ed. 1972). Judge Snepp did not infringe upon defendant's right of cross-examination by any means. On the contrary, he told defendant's counsel "I don't care what you ask Mr. Holmberg." This assignment is therefore without merit and is overruled.

[8]  In his next assignment of error, defendant argues that the trial court should have granted his motion for judgment as in case of nonsuit.

Defendant was originally charged with conspiracy to commit armed robbery, armed robbery, and felony-murder. All three charges were consolidated at defendant's first trial; however, a judgment of nonsuit was entered as to the charge of armed robbery.

Defendant now argues that since our Court held in its first opinion that a conviction of conspiracy to commit armed robbery does not merge into the murder charge, but is a separate offense, it cannot be used as a basis for a felony-murder conviction under G.S. 14-17. Defendant therefore concludes that he stands improperly convicted of first-degree murder since there is no principal felony upon which to base the felony-murder rule. Defendant's argument is based upon a misinterpretation of this Court's opinion.

[7]  It is well settled that "[w]hen a conspiracy is formed to commit a robbery or burglary, and a murder is committed by anyone of the conspirators in the attempted perpetration of the crime, each and all of the conspirators are guilty of murder in the first degree." *State v. Fox,* 277 N.C. 1, 17, 175 S.E. 2d 561, 571. *Accord, State v. Albert Lewis Carey, Jr., supra,* (former appeal in the present case) ; *State v. Anthony Douglas Carey,* 285 N.C. 497, 206 S.E. 2d 213, (companion case to the present one).

G.S. 14-17 expressly provides that a murder perpetrated in an attempt to commit robbery is murder in the first degree. For this reason, at the first trial the trial court properly refused to

submit the charge of armed robbery to the jury as a separate offense. It should not, however, have been nonsuited. Our statement to the contrary in the first opinion was an inadvertence. The theory of the State's case was that defendant and four others had conspired to rob with firearms the operator of a filling station and, in the attempted robbery, one of the conspirators, "Peanut" Mitchell, shot and killed James Sloop.

It is perfectly clear from the evidence that "Peanut" Mitchell was guilty of murder in the first degree, although he was later permitted to plead guilty to second degree murder.

*State v. Fox, supra,* holds in such a situation that all the conspirators are guilty of murder in the first degree. In the companion case of *State v. Anthony Douglas Carey, supra,* Justice Huskins, speaking for the Court, stated: "Those who enter into a conspiracy to violate the criminal laws thereby forfeit their independence, and jeopardize their liberty, for, by agreeing with another or others to engage in a unlawful enterprise, they thereby place their safety and freedom in the hands of each and every member of the conspiracy." *State v. Gibson,* 233 N.C. 691, 65 S.E. 2d 508 (1951).

"The felony-murder rule applies whenever a conspirator kills another person in the course of committing a felony, as against the contention that the killing was not part of the conspiracy. If the unlawful act agreed to be done is dangerous or homicidal in its character, or if its accomplishment necessarily or probably required the use of force and violence which may result in the taking of life unlawfully, *every party* in such agreement will be held criminally liable for whatever any of his co-conspirators may do in furtherance of the common design. [Citations omitted.]" *State v. Anthony Douglas Carey, supra,* at page 503.

It seems to us that the better practice where the State prosecutes a defendant for first-degree murder on the theory that the homicide was committed in the perpetration or attempt to perpetrate a felony under the provisions of G.S. 14-17, would be that the solicitor should not secure a separate indictment for the felony. If he does, and there is a conviction of both, the defendant will be sentenced for the murder and the judgment will be arrested for the felony under the merger rule. *State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975); *State v. Moore,* 284 N.C. 485, 202 S.E. 2d 169 (1973). If the separate felony indict-

ment is treated as surplusage, and only the murder charge submitted to the jury under the felony-murder rule, then obviously the defendant cannot thereafter be tried for the felony. *State v. Peele,* 281 N.C. 253, 188 S.E. 2d 326 (1972). So in this case it served no purpose to nonsuit the felony charge of armed robbery at the first trial and it should not have been done.

[8] Nevertheless, this does not prevent the use of this fact (attempt to commit armed robbery) in the prosecution of the defendant for murder in the first degree. To establish the defendant's guilt, the State proves the defendant's participation in the conspiracy to rob. It is the proof of this fact which makes the defendant equally guilty with Mitchell, the trigger man, under the rule of *State v. Fox, supra.* The use of the fact that the defendant participated in the conspiracy to rob in order to tie him to the shooting of Mr. Sloop by Mitchell does not change the offense of murder. The proof of murder in the first degree is complete when the State proves beyond a reasonable doubt that Mitchell shot and killed Mr. Sloop in Mitchell's attempt to rob him. The conspiracy to rob is not an element of the murder. The offense of first-degree murder would have been the same had there been no conspiracy between Mitchell and this defendant. The purpose of proving the conspiracy is not to establish an element of the crime of first-degree murder, but to fasten responsibility therefor upon the defendant along with Mitchell.

[9] Conspiracy is a separate offense from the attempt to rob. Conspiracy is a completed crime when it is formed, without any overt act designed to carry it into effect. Thus, it follows that the conspiracy to rob does not merge into the offense of first-degree murder. The defendant can properly be sentenced for both offenses. *State v. Albert Lewis Carey, Jr., supra; State v. Goldberg,* 261 N.C. 181, 202, 134 S.E. 2d 334 (1964) ; *State v. Brewer,* 258 N.C. 533, 539, 129 S.E. 2d 262 (1963) ; *State v. Davenport,* 227 N.C. 475, 494, 42 S.E. 2d 686 (1947).

It is clear, therefore, that the nonsuit motion of the defendant was properly overruled. It was entirely proper to submit the case to the jury as to the defendant's guilt of the separate offenses of conspiracy to rob and murder in the first degree. These offenses do not merge. This assignment of error is overruled.

[10] In his next series of assignments, defendant contends: (1) That the trial court committed prejudicial error in allowing the State to cross-examine defendant's wife concerning prior incon-

sistent statements and by inquiring into the statements by reading them into evidence; (2) that the trial court committed prejudicial error in permitting the State to introduce defendaant's wife's inconsistent statements into evidence; and (3) that the trial court erred in denying defendant's motion for a mistrial based on Nos. (1) and (2) above. Defendant has combined these questions in his brief for purposes of argument. We will do likewise.

Pamela Carey, defendant's wife, voluntarily testified for defendant and on direct examination more or less corroborated defendant's defense of alibi. However, on cross-examination, Pamela denied, among other things, that she knew James Calvin "Peanut" Mitchell before 10 July 1973 when she saw him at the Mecklenburg County jail. Upon further cross-examination Pamela admitted that she had signed two statements (State's Exhibits Nos. 12 and 13) in the presence of Officer H. R. Thompson on 10 July 1973. However, she denied having made any of the statements contained in either of these documents. Both of the prior statements indicated that Pamela had in fact known James Calvin "Peanut" Mitchell prior to 10 July 1973 and that she had been with her husband and "Peanut" and others on at least two occasions. State's Exhibit No. 12, about which Pamela was cross-examined, was offered into evidence by the State in rebuttal. It reads as follows:

"About a month ago, I don't remember whether it was morning or evening, but I had asked Butch [the defendant] to carry me to my mother's to check on her. When he left, he came back in about an hour. Tony Dorsey was with him and a boy named Peanut (I don't know his real name), and Anthony Carey. Butch asked me if I was ready to go, and I said I would be ready in a minute as I had just got out of the bathtub. We went up to 77. We got on 77 at Belhaven Boulevard. He went out 77 and he got off on Morehead. Butch said, 'I'll take you to your mother's in a minute. I want to stop right down here.' We then turned on the street next to the tuxedo rental place on South Boulevard. We turned down by that place and turned right, and he stopped at the first corner. I said, 'Since we are here, I'm going to stop and talk to Miss Evelyn.' Her sons were sitting on the porch. I saw Peanut raising up to get out, but I didn't pay any attention to where he was going.

"I talked to the boys on the porch, and then I walked up to Miss Bee's house where I saw Shelia Clark sitting on the porch. Then I talked to her about two or three minutes. When Butch left, he said, 'I'll be back in a minute.' Butch, Anthony, and Tony pulled out. They were gone about five or ten minutes. They were gone just long enough to have ridden around the block. Then I got in the car. Anthony, Peanut, Tony and Butch were already in the car when I got in.

"Then they went up Park Avenue and they took me to my mother's house on Wilmore Drive, and I got out. Peanut was laying down in the back of the car until we got down to about South Tryon and Park Avenue, and then he raised up out of the back seat. I didn't see a gun or anything. They let me out at my mother's and I said, 'Wait and let me see if she's home.' Butch said he'd be back in about an hour. I was looking at T.V. that night at home by myself, and I saw where the U-Drive It on South Boulevard was robbed or something, but I didn't pay attention to every detail. Then I got nervous and scared.

State's Exhibit No. 13 referring to 9 June 1973, about which Pamela was cross-examined, was offered into evidence by the State in rebuttal. It reads as follows:

"I was at home over on Oregon Street and Butch, Anthony, Tony and Peanut came by the house to get me. Butch said, 'Are you ready to go to the store?' I said, 'Yes, I'm ready.' Butch gave me a ten dollar bill and Tony, Anthony, Peanut, Butch and I got in the car. We came up to Rozzell's Ferry Road and Butch parked in the parking lot at Norman's Grocery Store. I got out and I went in the store. I stayed in there about fifteen minutes looking and seeing what I wanted to buy. As I came out the door, I saw Peanut running up the street, and he turned a corner to the left beside the store, and the boy who was running behind him stopped at the corner, and he put a gun up and he pulled the trigger. He didn't look around to see if anybody was standing on the street or nothing and just started shooting. He shot once. Peanut ran to the left beside the store. There was a truck there, and he got behind the truck and then ran on up the path. You can go up that path and get to where we stay.

"When Butch saw Peanut running, he drove off. Anthony, Tony and Butch were all in the car when he pulled out. They came back and picked me up and took me home. When we got there, Peanut was upstairs just sitting in a room. I saw him messing with his arm, and Peanut said, 'I can get it out.' and he took a knife he had in his pocket and pulled a little shot out of his shoulder. I told Butch to get Peanut out of the house and not to bring him back any more. I gave Butch the change, and he handed me three dollars back and told me to keep it. They all left in the car, and they came back without Peanut a little later."

G.S. 8-57 provides, in pertinent part, as follows: "The husband or wife of the defendant, in all criminal actions or proceedings, shall be a competent witness for the defendant, but the failure of such witness to be examined shall not be used to the prejudice of the defense. Every such person examined as a witness shall be subject to be cross-examined as are other witnesses. No husband or wife shall be compellable to disclose any confidential communication made by one to the other during their marriage."

When defendant's wife was examined as a witness for defendant, she was therefore subject to be cross-examined to the same extent as if unrelated to him. *State v. Bell*, 249 N.C. 379, 381, 106 S.E. 2d 495, 497 (1959). *See also State v. Tola*, 222 N.C. 406, 23 S.E. 2d 321 (1942). Accordingly, if based on information and asked in good faith, it was permissible for the district attorney to ask Pamela Carey about *her* prior inconsistent statements as they related to *her* previous relationship with "Peanut" Mitchell for purposes of impeachment. *See State v. Bell, supra.* See also *State v. Mathis*, 13 N.C. App. 359, 185 S.E. 2d 448 (1971), where the Court of Appeals dealt with a similar problem. *See generally* Comment, A Survey of the North Carolina Law of Relational Privilege, 50 N.C. L. Rev. 630 (1972). Both of Pamela's inconsistent statements revealed that she knew "Peanut" Mitchell prior to the date of this offense. But in neither of these statements does she say that her husband was involved in other crimes. In fact, she puts herself at a substantial distance from the events. In State's Exhibit No. 13 she does indicate that she heard about a robbery on the TV program that night. By this she certainly does not involve the defendant in that armed robbery. So the contention of the defendant that she could not be cross-examined on matters con-

cerning her husband's unrelated criminal offenses has no application to the facts of this case. The statements about which Pamela was cross-examined, and which were later offered into evidence, did nothing more or less than show that Pamela had made two prior inconsistent statements and by these she acknowledged that she had known "Peanut" Mitchell for more than a month before the date of the statements on 10 July 1973.

Justice Ervin in the landmark case of *State v. McClain*, 240 N.C. 171, 173, 81 S.E. 2d 364, 365 (1954), sets forth the rule upon which defendants rely:

> "The general rule is that in a prosecution for a particular crime, the State cannot offer evidence tending to show that the accused has committed another distinct, independent, or separate offense. [Citations omitted.] This is true even though the other offense is of the same nature as the crime charged. [Citations omitted.]"

Then follows the eight exceptions to the rule. We believe that one of these is applicable to our case. It reads:

> "6. Evidence of other crimes is admissible when it tends to establish a common plan or scheme embracing the commission of a series of crimes so related to each other that proof of one or more tends to prove the crime charged and to connect the accused with its commission. [Citations omitted.] Evidence of other crimes receivable under this exception is ordinarily admissible under the other exceptions which sanction the use of such evidence to show criminal intent, guilty knowledge, or identity." *Id.* at 176, 81 S.E. 2d at 367.

The defendant contends that the court committed prejudicial error by permitting the cross-examination of Pamela as to prior inconsistent statements and by the introduction of those inconsistent statements because they tended to implicate defendant in other unrelated crimes. We do not believe this to be so, but if it is subject to this interpretation, Rule 6 of the exceptions in *McClain, supra,* is authority for its competency.

Accordingly, for the reasons stated herein, these assignments are overruled.

[11] Defendant next contends that he was denied a fair and impartial trial due to the remarks, actions, and arguments made

State v. Carey

to the jury by the district attorney. During the cross-examination of Pamela Carey, she indicated that she had signed State's Exhibits Nos. 11, 12 and 13, but stated that she did not remember making any of those statements. At this time, the following occurred:

"MR. HASTY: If it please the Court, I would like for you to instruct the Solicitor to stop making facial expressions.

"COURT: Speak up, Mr. Hasty.

"MR. HASTY: I would like for you to instruct the Solicitor to stop making facial expressions to the jury in reply to the witness's question.

"COURT: I haven't observed him.

"MR. HASTY: Well, sir, I did.

"COURT: Well, I have not.

"MR. HASTY: All right, sir."

If defendant had wished to preserve this exception on appeal, then he should have attempted to place in the record what he complained were the facial expressions of the solicitor and how such expressions were prejudicial to him. There is nothing in the record to indicate what they were, and therefore, there is nothing for us to decide. For this reason, this contention is dismissed.

[12] Defendant's second contention under this general heading relates to the comments of the district attorney in his argument to the jury. The district attorney was discussing the alleged confession to Officer Holmberg in the presence of Officers Starnes and Whiteside when he said: "And he was brought in a list of armed robberies and said 'check these things off and put your name, put your initials by the ones that you were involved in,' *and that one was checked.*" (Emphasis supplied.) We find nothing objectionable in this statement. It seems to be only a reasonable comment on the evidence. State's Exhibit 8-A, as limited by the trial judge, had previously been offered into evidence as part of defendant's purported confession. This assignment is overruled. *See, e.g., State v. Stegmann, supra; State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125.

State v. Carey

**[13]** Defendant next contends that the solicitor engaged in impermissible jury argument when he told the jury that the "trigger" man was "Peanut" Mitchell, who was fifteen-years-old at the time, as compared to the defendant who was twenty-three-years-old. The district attorney further argued that it was not justice for a fifteen-year-old to carry the burden alone for the murder of Mr. Sloop; that the responsibility of the crime lay upon the shoulders of defendant Carey; that defendant Carey had been picking up "Peanut" Mitchell from time to time from May until July 1973; and that as a result of the planning of the defendant, a man was killed. This argument is certainly legitimate under all the evidence presented in this case. The district attorney did not venture into an area forbidden by this Court. He in no way created an atmosphere which prohibited the jury from arriving at the truth based upon the evidence. "In this jurisdiction wide latitude is given to counsel in the argument of contested cases. Moreover, what constitutes an abuse of this privilege must ordinarily be left to the sound discretion of the trial judge." *State v. Williams,* 276 N.C. 703, 712, 174 S.E. 2d 503, 509 (1970). *Accord, State v. Stegmann, supra; State v. Monk, supra; State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971).

Defendant next contends that the trial court committed prejudicial error in refusing to give defendant's requested instructions to the jury. In his brief, counsel for defendant states he understands that it is well within the trial court's province to select the manner and wording of the charge to the jury and that the court has discretion so long as it presents to the jury an accurate explanation of the law which applies in each case. Defendant argues that the instructions which were requested present the law applicable in a light which is neither more favorable to the State nor to the defendant. Defendant fails to state a proper cause for relief in this instance and his objections are all overruled.

Defendant next contends that the trial court committed prejudicial error in certain other portions of his charge to the jury. We have closely examined all of the instructions complained of and find them to be free from any prejudicial error. Therefore, these assignments are all overruled.

**[14]** Finally, defendant complains that it was error for the trial judge to enter the judgment of death. Defendant contends that the death penalty is not authorized under the Constitution

and the statutes of North Carolina. This Court has heretofore considered and a majority has consistently rejected all of the arguments on this point and does so here. *See, e.g., State v. Gordon,* 287 N.C. 118, 213 S.E. 2d 708 (1975) ; *State v. Boyd,* 287 N.C. 131, 214 S.E. 2d 14 (1975) ; *State v. Burns,* 287 N.C. 102, 214 S.E. 2d 56 (1975) ; *State v. Lampkins,* 286 N.C. 497, 212 S.E. 2d 106 (1975) ; *State v. Avery,* 286 N.C. 459, 212 S.E. 2d 142 (1975) ; *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975) ; *State v. Sparks,* 285 N.C. 631, 207 S.E. 2d 712 (1974) ; *State v. Honeycutt,* 285 N.C. 174, 203 S.E. 2d 844 (1974) ; *State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974) ; *State v. Dillard,* 285 N.C. 72, 203 S.E. 2d 6 (1974) ; *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974) ; *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974) ; *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973). No useful purpose would be served in reiterating the reasons for the above decisions. The death sentence was the only one that the court below could impose upon a conviction of first degree murder under authority of *State v. Waddell, supra.*

The defendant, age twenty-three, used James Calvin "Peanut" Mitchell, age fifteen, to accomplish the murder. He has been twice convicted by a jury. We have carefully considered the entire record and all of defendant's assignments of error. In his trial and conviction we find no error. The majority of this Court also holds that the sentence of death should be sustained. However, for the reasons stated in the dissenting opinions to *State v. Williams, supra,* 286 N.C. at 434-441, 212 S.E. 2d at 121-125, Chief Justice Sharp, Justices Copeland and Exum, dissent from that portion of this opinion affirming the imposition of the death sentence and vote to remand for the imposition of a sentence of life imprisonment.

No error.

Justice LAKE concurs in result.

Chief Justice SHARP dissenting.

According to the State's evidence, Mr. Sloop died 3 July 1973 from wounds inflicted by a sawed-off shotgun discharged by James Calvin "Peanut" Mitchell on 19 June 1973.

Defendant testified he did not know Mitchell prior to his arrest on 10 July 1973 on charges relating to the attempted robbery of 19 June 1973.

Pamela Carey, defendant's wife, testified she first met Mitchell on 10 July 1973 when she and her mother went to the Mecklenburg jail.

The court admitted in evidence, over defendant's objections, State's Exhibits 12 and 13, statements purporting to have been made by Pamela on 10 July 1973. At trial, under cross-examination, Pamela admitted she had signed these exhibits but testified the statements therein were not true.

Exhibit 12 shows that the statement first quoted in the court's opinion was made with reference to "Complaint #73-50216; Re: U-Drive It Rental Company; 1501 South Boulevard; Armed Robbery 6/8/73." Exhibit 13 shows that the statement last quoted in the court's opinion was made with reference to, "Complaint #73-50268; Re: Wyatt's Spur Station; 2815 Rozzells Ferry Road; Armed Robbery; 6-9-73."

When Exhibits 12 and 13 were admitted, the court instructed the jury they were for consideration only as bearing upon the credibility of Pamela's testimony *not* as bearing upon the guilt of the defendant.

The statements in these exhibits indicate that Pamela had testified falsely when she said she had not known Mitchell prior to 10 July 1973. However, they go far beyond the purpose for which they were purportedly offered, that is, to discredit Pamela's testimony by prior inconsistent statements. They are to the effect that defendant also testified falsely when he said he had not known Mitchell until after his arrest in connection with the attempted robbery of 19 June 1973. Further, although they fall far short of charging defendant, Mitchell, and others, with robberies on South Boulevard and on Rozzells Ferry Road the statements strongly suggest that defendant was involved in these robberies with Mitchell and others.

In *State v. Reid*, 178 N.C. 745, 747, 101 S.E. 104, 105 (1919), Justice (later Chief Justice) Hoke, speaking for the Court said: "Under our statute, Revisal, secs. 1634 and 35 [G.S. 8-57, 1974 Supp.] the wife was neither competent nor compellable to testify to her husband's hurt in a proceeding of this character and, *a fortiori*, her declarations against him should not be received when not made in his presence nor by his authority." Also, see *State v. Warren*, 236 N.C. 358, 360, 72 S.E. 2d 763, 764 (1952) ; *State v. Dillahunt*, 244 N.C. 524, 94 S.E. 2d 479 (1956) ;

1 Stansbury's North Carolina Evidence (Brandis Rev. 1973) § 59. Since the introduction or use of such evidence is forbidden by statute, in the furtherance of public policy, it is the duty of the trial judge, on his own motion, to disallow the evidence. *State v. Warren, supra* at 360, 72 S.E. 2d at 764.

Assuming arguendo that whether Pamela knew "Peanut" Mitchell on June 8th and 9th was material and not collateral to the issue whether defendant participated with him in the robbery on June 19th, the sole purpose for which these exhibits were admissible might have been attained by excising all portions of the statements except those to the effect that Pamela knew Mitchell and was with him and others on June 8th and June 9th of 1973. The instructions that the jury exclude from their consideration the prejudicial effect of these exhibits upon the credibility of defendant and upon his guilt was a futile gesture. *See State v. Gardner,* 226 N.C. 310, 37 S.E. 2d 913 (1946).

The Court holds applicable to the present factual situation the rule that "[e]vidence of other crimes is admissible when it tends to establish a common plan or scheme embracing the commission of a series of crimes so related to each other that proof of one or more tends to prove the crime charged and to connect the accused with its commission," this being the sixth exception to the exclusionary rule as stated by Justice Ervin in *State v. McClain,* 240 N.C. 171, 176, 81 S.E. 2d 364, 367 (1954). I disagree. When this exception is applicable the other crimes must be proven by competent substantive evidence, not by declarations admissible solely to impeach the credibility of the testimony of a defense witness. *See* 1 Stansbury's North Carolina Evidence (Brandis Rev. 1973) § 46.

For the reasons stated I vote to remand the case to the Superior Court for a trial *de novo.*

Justice BRANCH concurs in this dissenting opinion.