## STATE v. JOE LOUIS COX.

200 N. W. 2d 305.

August 4, 1972—No. 42780.

*C. Paul Jones,* State Public Defender, and *Doris O. Huspeni,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* and *David G. Roston,* Assistant County Attorneys, for respondent.

Heard before Knutson, C. J., and Rogosheske, Peterson, and Kelly, JJ.

PETERSON, JUSTICE.

Defendant, Joe Louis Cox, charged with first-degree murder and convicted of the lesser included offense of first-degree manslaughter, appeals from the judgment of conviction on the grounds that the trial court erred in refusing to suppress certain evidence which police allegedly obtained in violation of his Fourth Amendment rights and that the evidence was insufficient to support the jury's verdict. We affirm.

Defendant's claim that police violated his Fourth Amendment rights is twofold: (a) That police did not have probable cause to arrest him and (b) that the search incident to his arrest was excessive in scope.

(a) On July 20, 1969, shortly after 8:30 a. m., Nicholas Morales, a Mexican, died at North Memorial Hospital as a result of a gunshot wound after having been brought to the hospital from a one-car accident at 26th Avenue and Emerson Avenue North in Minneapolis. At 11:45 a. m. that morning Detective

Gerald Shoemaker of the Minneapolis Police Department, Homicide Division, responding to a report concerning Morales' death, began an investigation which culminated some 23 hours later in the warrantless arrest of defendant in an upper duplex at 1307 6th Street North, Minneapolis, known as Gussie Demery's tippling house.

During the course of his investigation, Detective Shoemaker received key information from two informants, who told him that a Joe or Joe Cox who worked at Gussie Demery's tippling house had shot a Mexican that morning. One of the informants, James Stanley Gibson, who ran a bar across the street from Gussie's and who in the past had furnished Shoemaker with accurate information, told Shoemaker that he had heard from someone else that a man named Joe, who worked at Gussie's, had shot a Mexican that morning. Gibson also said that he knew that Joe drove a white Mustang then parked outside of Gussie's. The other informant, one Zachary Burton (also known as Zachary Taylor), told Shoemaker that he had gone to Gussie's to buy wine and had been told by a person unknown to him that Joe Cox ("Joe, the fellow that ran the tippling house") had shot a Mexican that morning. Although Shoemaker had not received information from Burton on other occasions, he knew Burton and thought him trustworthy and reliable, partly because Burton held down a full-time job.[1]

Defendant argues with force that, regardless of the reliability and trustworthiness of Gibson and Burton, their information

---

[1] Unlike an informant whose information may come from his own criminal background or even complicity in the particular event reported, a private citizen, such as one who is employed in a lawful occupation and has had no occasion to have been a prior informant, may be presumed reliable. See, Pollack v. Superior Court, 272 Cal. App. 2d 548, 77 Cal. Rptr. 565 (1969); People v. Lewis, 240 Cal. App. 2d 546, 49 Cal. Rptr. 579 (1966); State v. Mazzadra, 28 Conn. Sup. 252, 258 A. 2d 310 (1968); People v. Carter, 116 Ill. App. 2d 62, 253 N. E. 2d 490 (1969); Brown v. United States, 125 App. D. C. 43, 365 F. 2d 976 (1966); United States v. Ganter, 436 F. 2d 364 (7 Cir. 1970).

implicating him was nonetheless unreliable because it was based on unreliable hearsay and rumor. This argument would merit more consideration if it appeared that Detective Shoemaker had based his probable-cause determination solely on his conversations with Gibson and Burton. But Shoemaker's conversations with these two informants were not the sole factual basis for his probable-cause determination, their information being confirmed in an impressive way by his total fund of independent knowledge.

Significantly, Shoemaker, after talking with Burton, learned from another detective in the department that an unidentified informant had told him that Burton had actually been at Gussie's at the time of the shooting. From this information Shoemaker reasonably could infer that Burton's statement implicating defendant was based, if not on first-hand knowledge gained through his own observation, at least on something more than mere gossip or casual rumor.

Significantly, and as a result of his careful and thorough investigation, Shoemaker knew the following facts substantially tending to corroborate the information furnished by Gibson and Burton:

(1) He knew of his own knowledge that Morales was Mexican.

(2) He knew that Morales had not been shot while in his automobile. The path of the bullet, as established by the medical examination, suggested otherwise, as did the fact that no expended cartridges or bullets could be found in Morales' automobile.

(3) He knew from the fact that the fully-loaded automatic pistol found in Morales' car was cocked that Morales must have been involved in some kind of armed confrontation.

(4) He knew that Morales had been shot a short time before he died and that tippling houses were open at that hour.

(5) He knew from Morales' friends that the defendant frequented Gussie Demery's tippling house, and he knew of his own knowledge that Morales was employed as a part-time bartender in that immediate vicinity.

(6) He knew that Gussie's was on the second floor so that

someone at Gussie's could have shot Morales from an elevated position, such as the top of the stairs, which would have been consistent with the medical finding about the path of the bullet.

(7) He checked and found that the white Mustang reportedly owned by defendant and parked outside Gussie's was registered in the name of Joe L. Cox.

(8) He knew that Cox had been convicted in Minnesota of robbery, a crime of violence.[2]

(9) He knew from other sources that on the night after the shooting and before any arrest had been made, no one had left or entered Gussie's despite the fact that on a typical night more activity at a tippling house could have been expected.

We recently summarized in State v. Bruno, 293 Minn. 84, 196 N. W. 2d 459 (1972), the standards which govern our review of a police officer's on-the-spot assessment of probable cause for a warrantless arrest. As there stated, we must decide each case on its own facts, guided not by any magic formula but by the standard of reasonableness. In applying this standard we should not be overly technical and should accept the officer's probable-cause determination if reasonable and prudent men, not legal technicians, would under the same circumstances make the same determination.

Considering Detective Shoemaker's probable-cause assessment in this light, we hold that he did not act without probable cause in arresting defendant. We conclude that his professionally thorough investigation uncovered facts which provided him with a substantial basis for believing that the information given him by the two named informants was based on something more than dubious hearsay or casual rumor.

(b) Defendant contends, in addition, that the arresting officers violated his Fourth Amendment rights in that the search incident to his arrest exceeded the permissible scope declared

---

[2] As to the propriety of considering this fact in assessing probable cause, see United States v. Harris, 403 U. S. 573, 582, 91 S. Ct. 2075, 2081, 29 L. ed. 2d 723, 733 (1971).

in Chimel. v. California, 395 U. S. 752, 89 S. Ct. 2034, 23 L. ed. 2d 685 (1969).

The United States Supreme Court held in Chimel that when police arrest a suspect at a house they may conduct a search incident to arrest but must limit it to the suspect's person and the area within his immediate control, that is, the area from within which the suspect might gain possession of a weapon or destructible evidence.[3] Judicial application of the Chimel rule, as pointed out in Note, 55 Minn. L. Rev. 1011, 1016, has evolved such criteria as whether arrestee was handcuffed or under control, the number of arresting officers present, the number of people arrested, and the nature and size of the evidence seized.

The circumstances of defendant's arrest disclose no fatal excess under the Chimel rule. Shortly after 10 a. m. on the day following the shooting, Detective Shoemaker, accompanied by six other officers, knocked on the door to the upper duplex apartment which housed Gussie's tippling house, announced their authority, and, after hearing no response, began to break down the door. They were then admitted by Helen Ingram, defendant's girl friend, who told them that defendant was in the bedroom. The officers entered the bedroom, where they found defendant dressed only in his underwear and seated on the edge of the bed. They arrested him and then seated him upon a chair within the bedroom. At some point the officers handcuffed defendant, but it was not clear from the Rasmussen hearing testimony whether they did this before, at the same time, or after they started to search the bedroom. However, testimony at trial indicated that they handcuffed defendant immediately upon entering the room and commenced the search either contemporaneously with or immediately after handcuffing him. During the course of the search of the bedroom, an officer lifted one of two cushions from a settee or davenport and found a .38 caliber

---

[3] Of course, they may also seize evidence in plain view under certain circumstances. See, Coolidge v. New Hampshire, 403 U. S. 443, 91 S. Ct. 2022, 29 L. ed. 2d 564 (1971).

Colt Cobra revolver later identified by police experts as the gun from which the fatal bullet was fired. Shoemaker estimated that the nearest part of the settee was 5 to 8 feet from the point on the bed where defendant was sitting when police entered the room and that the settee was approximately 3 feet from the chair in which they seated defendant.

We hold that the search was valid to the extent that the officers stayed within the bedroom, the area within defendant's immediate control.[4] The fact that defendant may have been handcuffed at the time the police searched that limited area is not alone a sufficient factor to distinguish this case from other cases in which we have approved the search involved as being limited to the area within the arrestee's immediate control. See, State v. Fulford, 290 Minn. 236, 187 N. W. 2d 270 (1971) (knife seized by one of several arresting officers from suspect's coat on a chair a few feet from his person at the time of his arrest); Simberg v. State, 288 Minn. 175, 179 N. W. 2d 141 (1970) (search of suspect's trousers on chair 6 feet from point of arrest).

■ A short summary of some of the more important evidence against defendant demonstrates that the evidence sufficiently supported the jury's verdict of guilty.

Morales, according to the testimony of numerous witnesses, frequented Gussie's. Two witnesses, including defendant's girl friend, placed Morales at Gussie's on the morning that the fatal shooting occurred; and the jury had before it defendant's own out-of-court statement to police in which he admitted that Morales was at Gussie's that morning. An expert from the Bureau of Criminal Apprehension testified that the bullet which

---

[4] The police actually conducted a search of the entire apartment, thus not limiting their search to the area within defendant's immediate control. Although the search to this extent was clearly impermissible, it produced no incriminating evidence and accordingly involves no application of the exclusionary rule.

killed Morales was fired from the gun which police seized when they arrested defendant at Gussie's.

Defendant's girl friend, testifying under subpoena, gave the following story relating to the particular circumstances of the shooting of Morales at that place and time: She and defendant had argued in Morales' presence and Morales had gotten angry at defendant for slapping her; Morales left but returned 5 minutes later with a gun which he pointed at defendant; she ran into the bathroom when she saw the gun and then heard a noise which sounded "like a bang, a car backfiring or something"; she emerged from the bathroom thinking that Morales had shot defendant but was told by both of them that the noise came from outside; she then told Morales that he didn't look good, whereupon he left.

The exculpatory detail that the noise defendant's girl friend heard was not a gunshot was refuted by other evidence. Upon court-permitted cross-examination by the prosecutor, she admitted that she "could have" given this different statement to police: That after hearing the bang she came out, saw only defendant, went to the open apartment door, and called down the stairs asking Morales if he was all right, to which he answered "I'm okay." Another witness testified that on the morning of the shooting at 7:30 a. m. he was standing outside Gussie's and saw Morales come down, go back up, and then come down a second time around 7:44 a. m. From the pathologist's testimony as to the time lapse before death might ensue from the hemorrhage of the gunshot wound—a time interval consistent with the driving time from Gussie's to the place where Morales was found in his automobile—the jury well could infer that Morales was shot about the time this last witness said he saw Morales leaving Gussie's.

Affirmed.