STATE OF NORTH CAROLINA v. JOHNNY CHERRY, ALIAS RAEFORD CHERRY

No. 47

(Filed 4 September 1979)

1. **Searches and Seizures § 7— seizure as incident of lawful arrest—plain view—pistol under rug**

A pistol was lawfully seized from defendant's motel room as an incident to his lawful arrest and under the plain view doctrine where officers went to the motel room to arrest defendant pursuant to an arrest warrant; another occupant fled from the room and told the officers that defendant had a pistol; defendant did not respond to the officers' continued demands that he come out of the room for about thirty minutes; defendant finally stuck his hands out the door and officers handcuffed him, entered the room and seated defendant in a chair; an officer observed a lump in the rug in the corner of the room and stated, "There is your gun"; and the rug was pulled back and the pistol was seized.

2. **Criminal Law § 135.4— first degree murder—sentencing hearing—inadmissibility of affidavits concerning death penalty**

In a sentencing hearing in a first degree murder case, the trial court did not unduly limit the jury's consideration of mitigating factors in violation of G.S. 15A-2000(f)(9) by his exclusion of (1) an affidavit of a convicted murderer who had been sentenced to death and then received a sentence of life imprisonment at a retrial that he had been rehabilitated, released, and holds a responsible government position; (2) an affidavit that the death penalty is counterproductive as a deterrent to crime; (3) an affidavit of a newspaper reporter that he believed innocent persons are executed from time to time; and (4) affidavits from several ministers expressing their opposition to the death penalty on religious grounds, since such evidence was in no way connected with defendant, his character, his record or the circumstances of the charged offense and was, therefore, irrelevant and of no probative value as mitigating evidence. Nor did the exclusion of such affidavits violate rights guaranteed to defendant by the Eighth and Fourteenth Amendments to the U. S. Constitution.

3. **Criminal Law § 126.3— jurors' impeachment of verdict**

After a verdict has been rendered and received by the court and the jury has been discharged, jurors will not be allowed to attack or overthrow their verdict, nor will evidence be received from them for such purpose, and this rule cannot be circumvented by the testimony of another as to what the juror said.

4. **Criminal Law §§ 126.3, 135.4— first degree murder—death penalty—juror's impeachment of verdict—knowledge of parole possibility for life sentence**

In a sentencing hearing in a first degree murder case, the possibility that jurors knew that defendant might be eligible for parole in 20 years if the jury recommended life imprisonment would not permit a juror to attack and im-

State v. Cherry

peach his verdict recommending the death sentence after it was received by the court, especially where there was neither argument by the State nor instruction by the court on the question of parole eligibility.

5. **Criminal Law § 126.3— first degree murder—death penalty—juror's impeachment of verdict—knowledge of parole possibility for life sentence—effect of G.S. 15A-1240(c)(1)**

Testimony by a newspaper reporter that a juror told her the jury had recommended the death sentence for defendant because the jurors knew defendant would be eligible for parole in 20 years if he was sentenced to life imprisonment was not rendered admissible to impeach the verdict by G.S. 15A-1240(c)(1), since a juror's knowledge that there is a possibility of parole for a defendant would not "violate the defendant's constitutional right to confront the witnesses against him."

6. **Constitutional Law § 80; Criminal Law § 135.1— constitutionality of death penalty—unbridled discretion of district attorney to calendar cases**

The trial court did not err in refusing to permit the defendant to present evidence that the district attorney abused his discretion in the calendaring of cases to support his contention that the N. C. death penalty unconstitutionally denies a defendant due process by permitting the district attorney to "calendar cases when he chooses in front of whatever judge he chooses," where there was no allegation or intimation that the district attorney deliberately employed any "unjustifiable standard such as race, religion or other arbitrary classification" in setting this or any other case involving the death penalty. Furthermore, even if the district attorney had exercised unbridled discretion in setting cases before judges of his choice, such action would not be relevant to the constitutionality of the death penalty, since under G.S. 15A-2000 *et seq.* the jury has the sentencing power and the trial judge is bound by the jury's sentencing recommendation.

7. **Criminal Law § 135.3; Jury § 7.11— first degree murder trial—exclusion of jurors for death penalty views during guilt phase**

The trial court did not err in excluding for cause during the guilt phase of a bifurcated trial for first degree murder potential jurors who indicated that they could not recommend the imposition of the death penalty under any circumstances and would automatically vote against the imposition of the death penalty without regard to the evidence, since Art. 100 of G.S. Ch. 15A contemplates that the same jury shall hear both phases of the trial unless the original jury is "unable to reconvene," G.S. 15A-2000(2), and the U. S. Supreme Court has approved the bifurcated trial procedure in which the same jurors hear both phases of the trial.

8. **Constitutional Law § 43; Criminal Law § 66.5— right to counsel—counsel excluded from conference with witnesses before lineup**

Defendant was not denied his right to counsel at a crucial stage of the proceedings because his counsel was not permitted to be present when an assistant district attorney talked with State's witnesses prior to a lineup procedure. Furthermore, even if there was a violation of defendant's Sixth Amendment rights because of the exclusion of his counsel from the conference

between the prosecution and the State's witnesses, such error would be harmless beyond a reasonable doubt since defendant does not contend that there was any impermissible suggestiveness in the lineup procedure.

**9. Criminal Law § 34.7— evidence of other crimes —competency to show motive**

In this prosecution for a murder committed during the perpetration of an armed robbery of a Jiffy Market, testimony that, on the same day as the robbery-murder, defendant told two witnesses that he planned to rob a Jiffy Mart but was unable to do so because there were people nearby, that he planned to rob a washerette but did not do so because it was too crowded, and that he robbed a Frito Lay delivery man earlier that day, and testimony that defendant used proceeds from both of the robberies which he committed to buy heroin and cocaine which he and the two witnesses "shot up," *held* competent to show that defendant's motive in committing the robbery in question was to obtain money to buy drugs.

**10. Criminal Law § 135.4— conviction under felony-murder rule —underlying felony not aggravating circumstance**

When a defendant is convicted of first degree murder under the felony-murder rule, the trial judge may not submit to the jury at the sentencing phase of the trial the aggravating circumstance of the underlying felony found in G.S. 15A-2000(e)(5).

Justice BROCK did not participate in the consideration or decision of this case.

Justice HUSKINS concurring and joins in the concurring opinion of Justice CARLTON.

Justice CARLTON concurring.

APPEAL by defendant from *Thornburg, J.,* 6 March 1978 Schedule "B" Session of MECKLENBURG Superior Court.

Defendant was charged in a bill of indictment, proper in form, with the first degree murder of Eugene Howard.

Upon defendant's affidavit of indigency, the public defender was appointed to represent defendant.

Pursuant to motion of counsel, defendant was on 7 December 1977 committed to Dorothea Dix Hospital for observation and treatment to determine, inter alia, if he was competent to proceed to trial. By letter dated 15 December 1977, the court was advised that the medical staff of Dorothea Dix Hospital had completed their examination of defendant and "found him competent to proceed."

At the guilt determination phase of the trial, the State offered evidence tending to show that on 15 September 1977 be-

tween the hours of 6:00 and 7:00 p.m. defendant, armed with a pistol, entered Tony's Jiffy Market located on North Church Street in Charlotte, North Carolina. By the threatened use of the pistol, he first took a .38 Colt Special pistol from the person of Delton Wilkinson, who was standing in the store, and then by the threatened use of the weapon forced Wilkinson, Eugene Howard, an employee of the market, Ervin Gene Holloway, a part-time employee of the market, and Dickson Bailiff into the store's refrigerated room or "cooler." Defendant then took Mr. Howard to the cash register and ordered him to open it. When Mr. Howard refused, a struggle ensued during which Howard temporarily seized possession of the pistol. However, defendant retrieved the pistol and struck Howard three or four times before returning him to the cooler. After defendant opened the cash register, Howard Oberg entered the store and he was also forced into the cooler. While defendant was closing the cooler door, Fred Patton entered the building and he also was ordered into the cooler. At that point, Mr. Howard and others attempted to hold the door closed, but defendant pulled the door open and shot into the cooler striking the refrigeration compressor. After ordering everyone to take their hands off the door, defendant opened the door and inquired about a money pouch and was told that there was no more money.

According to the State's witness Holloway:

. . . The next thing that happened was when Mr. Howard grabbed the door and shut it. Cherry opened the door again and after the door was opened, I saw the gun come in. The gun went off and shot Mr. Howard in the face, and he fell to the floor.

We note that this same witness testified on voir dire as follows:

. . . Mr. Howard told him that the only money was in the cash register. Mr. Howard *then grabbed the gun, and the gun went off*. The shot hit Mr. Howard in the face. . . . [Emphasis added.]

The witnesses Wilkinson and Holloway made pretrial identifications and positive in-court identifications of defendant as the perpetrator of the armed robbery and killing. The witness Wilkin-

son also identified State's Exhibit 15 as a pistol taken from him by defendant during the robbery. This exhibit was seized in a motel room occupied by defendant at the time of his arrest.

Valaria Spencer in essence testified that she had known defendant for a short time and had only known him by the name of "Blue." She stated that when she awakened on 15 September 1977, defendant was asleep in another bed in her bedroom. When he left at about 1:00 p.m., he told her that he was going to rob a woman at the "Jiffy Mart." He returned in about ten minutes and said that there were some people on the porch next to the store, and he did not get a chance to commit the robbery. Later in the afternoon, she observed him going toward a Frito-Lay truck and at that time she went home. About ten minutes later, defendant came to her home with about $100 which he said he had gotten from the "Frito" man. Later in the afternoon, defendant purchased and used both heroin and cocaine. He also obtained a pistol from a man called "Red." Defendant then left her home and returned in about an hour with $300 or $400 and at that time took a pistol from his shirt. This was not the same pistol he had obtained from "Red." The witness identified State's Exhibit 15 as the pistol that defendant produced from his shirt. Shortly thereafter, defendant purchased more cocaine and heroin which he, the witness and her sister "shot into their arms." Later in the evening, defendant told her sister that he had shot a man.

State's witness Billy Ray Frye, Jr., a route salesman for Frito-Lay, testified that on the afternoon of 15 September 1977 at around 3:00 o'clock, he was robbed of about $35 or $40 by a black male who was about six feet tall. The robbery occurred in front of the Little General Grocery at the corner of Davidson and Charlotte Streets in Charlotte, North Carolina. He was unable to see this person well enough to identify him.

Defendant offered no evidence on the innocence-guilt phase of the trial. The jury returned a verdict of guilty of first degree murder.

On the penalty phase of the trial, the State offered a stipulation that defendant was convicted on the 26th of January, 1973, of the offense of armed robbery.

On this phase of the trial, defendant offered testimony by his father and mother which tended to show that during the time defendant lived with his parents he was obedient, attended church and never gave his parents any kind of trouble. He left his parents' home and dropped out of school when he was sixteen years old.

Richard Alsop, an employee of Duke Power Company, testified that he was associated with defendant while defendant was a prisoner on a project which permitted defendant to work outside the confines of the prison. He stated that he found defendant to be alert, cooperative and dependable. The witness surmised that defendant obeyed prison rules since he was permitted to work outside.

Betty Cherry, defendant's wife, testified that she married defendant in February, 1976, and that he worked regularly and was good to her children until he returned to North Carolina in August, 1977.

Randy Wright, a boyhood friend, said that he introduced defendant to drugs in the summer of 1977 and that prior to that time defendant was not a user of drugs.

The jury returned its sentence recommendation that defendant's punishment be death.

*Rufus L. Edmisten, Attorney General, by Thomas F. Moffitt, Assistant Attorney General, and Joan H. Byers, Assistant Attorney General, for the State.*

*Fritz Y. Mercer, Jr., Public Defender, and Donna Chu, Assistant Public Defender, of Counsel for defendant appellant.*

*Mraz and Meacham, P.A., by Mark A. Michael, for defendant appellant.*

*Wade M. Smith and Roger W. Smith, of Counsel for defendant appellant.*

BRANCH, Justice.

[1] Did the trial judge err by admitting into evidence a pistol seized without a search warrant from a motel room occupied by defendant at the time of his arrest?

Unreasonable searches and seizures are prohibited by the fourth amendment to the United States Constitution, and all evidence seized in violation of the Constitution is inadmissible in a State court as a matter of constitutional law. *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376 (1968), *cert. denied,* 393 U.S. 1087. However, it must be borne in mind that only *unreasonable* searches and seizures are prohibited by the Constitution. *Carroll v. United States,* 267 U.S. 132, 69 L.Ed. 543, 45 S.Ct. 280 (1925). An unreasonable search has been defined as "an examination or inspection without authority of law of one's premises or person, with a view to the discovery of . . . some evidence of guilt to be used in the prosecution of a criminal action." *State v. Robbins,* 275 N.C. 537, 169 S.E. 2d 858 (1969). The protection against unreasonable searches and seizures is "the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile. There he is protected from unwarranted governmental intrusion." *Hoffa v. United States,* 385 U.S. 293, 301, 17 L.Ed. 2d 374, 87 S.Ct. 408 (1966). It is basic that, subject to a few specifically established exceptions, searches conducted without a properly issued search warrant are *per se* unreasonable under the fourth amendment, *Katz v. United States,* 389 U.S. 347, 19 L.Ed. 2d 576, 88 S.Ct. 507 (1967), and the best assurance of reasonableness lies in obtaining a properly issued search warrant. Two of the recognized exceptions, pertinent to decision of this assignment of error, are search incident to a lawful arrest, *Harris v. United States,* 331 U.S. 145, 91 L.Ed. 1399, 67 S.Ct. 1098 (1947); *State v. Streeter,* 283 N.C. 203, 195 S.E. 2d 502 (1973), and seizure of items falling within the plain view doctrine, *Harris v. United States,* 390 U.S. 234, 19 L.Ed. 2d 1067, 88 S.Ct. 992 (1968); *State v. Alford,* 289 N.C. 372, 222 S.E. 2d 222 (1976), *death sentence vacated,* 429 U.S. 809. The United States Supreme Court has limited the scope of reasonable search when made incident to an arrest to the area from which the arrested person might have obtained a weapon or some item that could have been used as evidence against him. *Chimel v. California,* 395 U.S. 752, 23 L.Ed. 2d 685, 89 S.Ct. 2034 (1969); *Shipley v. California,* 395 U.S. 818, 23 L.Ed. 2d 732, 89 S.Ct. 2053 (1969). Even so this seemingly stringent rule has been subject to interpretation by other courts particularly in connection with the well-established rule that whether a search and seizure is unreasonable must be determined upon

the facts and circumstances surrounding each individual case. *State v. Howard*, 274 N.C. 186, 162 S.E. 2d 495 (1968). We find it helpful to review some of these decisions.

In *State v. Quinn*, 565 S.W. 2d 665 (Mo. Ct. App. 1978), the defendant challenged the admission of a gun into evidence on the basis that it was the product of an illegal search and seizure. In *Quinn* there had been an armed robbery, and the victim had described his assailants to the police. The police officers having these descriptions saw defendant and a Miss Sullivan, who fit the descriptions furnished the police, sitting on the steps of a building. Defendant had a brown bag 18 by 24 inches in size in his hand, and when the police officers called him to their car, he handed the bag to Miss Sullivan. When she was also summoned to the automobile, she placed the bag on the step of the building. Thereupon, one of the officers picked up the bag because he "presumed it was their property." Although he could not see the gun, he "felt" it when he picked up the bag. The Court of Appeals of Missouri, upon viewing the totality of the circumstances, found no violation of defendant's fourth amendment rights and in so holding, in part, reasoned:

> . . .[T]here was not an unreasonable "seizure"—the ultimate test under the Fourth Amendment—in retrieving the bag and "seizing" the gun. The officer saw two people on the porch, not in a home, with a bag. The officer could reasonably anticipate that it belonged to one or the other or both. The appellant does not question that the officer had probable cause to stop and arrest the appellant. When he placed appellant in the cruiser, he was in effect arrested. A robbery had just occurred; the bag was left on the step; the officer was going to take the two into custody. If the officer did not retrieve the bag on the step, he may well have been subject to criticism or at worst legal action. To wait on the street and "stand over" the bag until a search warrant could be obtained would be impractical. The test is not whether it is reasonable to obtain a warrant but whether the seizure of the bag under these circumstances was reasonable. *See Mulligan v. United States*, 358 F. 2d 604, 607 (8th Cir. 1966). The Fourth Amendment does not require that the police blindly ignore evidence which is left under such circumstances. *See Brewer*, 540 S.W. 2d at 231. The practical

and reasonable action was to retrieve the bag, and, upon taking possession of the bag, the officer was justified in taking the gun found in the fold. . . .

\*  \*  \*

. . .[T]he retrieval of the bag came within the "plain view" exception to the warrant requirement although the contents of the bag were not readily perceived. "Plain view" alone is not sufficient to justify a warrantless seizure. It is also necessary that (1) the evidence be observed in plain view while the officer is in a place where he has a right to be, (2) the discovery of the evidence is inadvertent and (3) it is apparent to the police that they have evidence before them. *Collett*, 542 S.W. 2d at 786; *Coolidge*, 91 S.Ct. at 2037. These requirements are met here. . . .

The Supreme Court of the United States in *United States v. Chadwick*, 433 U.S. 1, 53 L.Ed. 2d 538, 97 S.Ct. 2476 (1977), again approved a warrantless search when made incident to a lawful arrest in the following language:

Such searches may be conducted without a warrant, and they may also be made whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence. The potential dangers lurking in all custodial arrests makes warrantless searches of items within the "immediate control" area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved. . . .

*State v. Austin*, 584 P. 2d 853 (Utah 1978), is a case strikingly similar to the case before us for decision. There defendant was convicted of aggravated robbery, and at trial moved to suppress certain charred papers found in a waste basket in his hotel room and a roll of nickels found on a chair in the hotel room where he was arrested. The trial judge denied defendant's motion to suppress, and in affirming that ruling, the Supreme Court of Utah stated:

Appellant does not challenge the legality of his arrest but maintains that because he was handcuffed, he had no "control" over the area; therefore, the search cannot be justified under the *Chimel* standard. . . .

*     *     *

The effect of putting handcuffs on the person under arrest has not been held to negate the existing circumstances surrounding a search but is considered to be only one factor in determining the necessity for the search. Several jurisdictions have addressed this specific issue. In *State v. Cox* [294 Minn. 252, 200 N.W. 2d 305 (1972)] a search was made after handcuffing the defendant. The Minnesota Court held as follows:

> . . . that the search was valid to the extent that the officers stayed within the bedroom, the area within the defendant's immediate control. The fact that defendant may have been handcuffed at the time the police searched that limited area is not alone a sufficient factor to distinguish this case from other cases in which we have approved the search involved as being limited to the area within the arrestee's immediate control. . . .

In *People v. Floyd* the New York Court said at page 563, 312 N.Y.S. 2d at page 196, 260 N.E. 2d at page 817:

> . . . It suffices that it is not at all clear that the 'grabbing distance' authorization in the *Chimel* case is conditioned upon the arrested person's continued capacity 'to grab.'

It thus appears that the defendant in custody need not be physically able to move about in order to justify a search within a limited area once an arrest has been made. This same position was affirmed in *People v. Fitzpatrick* [32 N.Y. 2d 499, 346 N.Y.S. 2d 793, 300 N.E. 2d 139 (1973), *cert. denied*, 414 U.S. 1033]:

> . . . And the fact that the police had handcuffed the defendant did not render the closet search [where he was found and removed from] unauthorized.

In the instant matter, the police went to the hotel and knocked on the door. They were admitted into the room where they proceeded to arrest the appellant. Any subsequent search of the immediate area, whether to find concealed weapons or to preserve evidence that was in danger of being destroyed, was proper as incident to a valid arrest. No

warrant was required as long as the search was properly confined to a limited area within the appellant's control. Here, the search was restricted to a single room where the defendant was arrested and held in custody. He was present during the search. Under the foregoing authorities, we hold that a search so limited is valid without a warrant.

In *United States v. Wright*, 577 F. 2d 378 (6th Cir. 1978), the United States Court of Appeals (6th Cir.), in considering a contention that there was an illegal search and seizure succinctly stated:

> . . . It is the law of this Circuit that once the right to search attaches, it is not lost when the arrested person is handcuffed and unable to reach areas otherwise within his or her "immediate control" . . . .

In instant case, the evidence before the Court tends to show that a man registered at Orvin Inn under the name of Luther Davis. At approximately 11:45 a.m. on 16 September 1977, Charlotte police officers armed with a valid warrant for the arrest of defendant came to the motel premises and asked the manager for a key to Room 270. The manager furnished the key stating, "Do what you got to do." Thereupon, the officers knocked on the door to Room 270, identified themselves as police officers and demanded that the door be opened. A short time later, a scantily clad woman ran from the room and informed the officers that defendant Cherry was in the room and that he had a pistol. Defendant did not respond to the officers' continued demands that he come out of the room for a period of about thirty minutes. Finally, he came to the door and stuck his hands out. He was handcuffed, and the officers entered the room and seated defendant in a chair. The room was approximately nine feet by twelve feet in size, and there were several police officers in the room. One of the policemen observed a lump in the rug in the corner of the room and said, "There is your gun." The rug was pulled back and a .38 caliber pistol introduced at trial as State's Exhibit 15 was seized.

Defendant does not contend that his arrest was illegal. The officers handcuffed defendant and entered the motel room to effect defendant's arrest and did not make entry for the purpose of making a general search for evidence of defendant's guilt. Thus, the officers were in a place where they had a right to be and in-

advertently observed the lump in the rug which was in plain view. The nine by twelve foot motel room was an area under defendant's immediate control, and the officers saw the lump in the rug with the knowledge that defendant had a gun in the area which was under his immediate control. Thus, it was proper and reasonable for the officers to examine the suspicious lump in the rug which was in plain view and to seize the weapon from this area. The fact that defendant was handcuffed did not affect the lawfulness of the seizure. Further, to have required the officers to obtain a search warrant under these conditions would be to refute the test of reasonableness required by the fourth amendment to the United States Constitution.

We hold that there was no unreasonable search and seizure and that the trial judge correctly denied defendant's motion to suppress.

[2] Defendant assigns as error the ruling of the trial judge excluding certain evidence at the sentencing phase of the trial. The evidence excluded was:

    (1) Affidavit of one Lloyd McClendon that he had been convicted of felony murder in New Mexico and received a sentence of death; that he received a new trial and upon his second trial received a sentence of life imprisonment; that he has been released from prison, is successfully rehabilitated and now holds a responsible government position in the State of Ohio.

    (2) Affidavit of Dr. William Bowers that the death penalty is counterproductive as a deterrent to crime.

    (3) Affidavit of a newspaper reporter to the effect that he believed innocent persons are executed from time to time.

    (4) Affidavits from several ministers expressing their opposition to the death penalty on religious grounds.

Defendant initially argues that the trial judge unduly limited the jury's consideration of mitigating evidence in violation of the provisions of G.S. 15A-2000(f)(9). That statute in pertinent part provides that at the sentencing phase of the bifurcated trial, the jury may consider "any other circumstance arising from the evidence which the jury deems to have mitigating value." G.S.

15A-2000(a)(3) provides in part that, "Evidence may be presented as to any matter that the court deems relevant to sentence . . . or . . . to have probative value."

The language of this statute does not alter the usual rules of evidence or impair the trial judge's power to rule on the *admissibility* of evidence. However, defendant argues that our North Carolina case law mandates the admission of this evidence. We do not agree. Our examination of the cases cited by defendant in support of this position discloses that the factors to be considered in sentencing are the *defendant's* age, character, education, environment, habits, mentality, propensities and record. *State v. Stafford,* 274 N.C. 519, 164 S.E. 2d 371 (1968); *State v. Dye,* 268 N.C. 362, 150 S.E. 2d 507 (1966); *State v. Cooper,* 238 N.C. 241, 77 S.E. 2d 695 (1953). Such matters are obviously relevant in considering mitigation of punishment.

Generally, evidence is relevant and admissible when it tends to shed any light on the matter at issue. Evidence which has no such tendency is inadmissible. 1 Stansbury, North Carolina Evidence, section 77 (Brandis rev. 1973). The evidence here offered and excluded by the trial judge was in no way connected to defendant, his character, his record or the circumstances of the charged offense. It was, therefore, irrelevant and of no probative value as mitigating evidence in the sentencing procedure of defendant's trial. Thus, the trial judge's ruling excluding this evidence did not unduly limit the jury's consideration of mitigating factors in violation of G.S. 15A-2000(f)(9).

Even so, defendant further argues that the trial judge's failure to admit this evidence limited the jury's consideration of mitigating factors so as to violate his rights guaranteed by the eighth and fourteenth amendments to the United States Constitution. In support of this argument, defendant relies upon the case of *Lockett v. Ohio,* --- U.S. ---, 57 L.Ed. 2d 973, 98 S.Ct. 2954 (1978). In *Lockett* the defendant attacked the constitutionality of the Ohio death statute on the grounds that the statute narrowly limited the sentencer's discretion. The statute provided that once a person is convicted of aggravated murder with at least one of seven specified aggravating circumstances the death penalty must be imposed unless the sentencing judge determined that at least one of the following mitigating circumstances is established

by a preponderance of the evidence: "(1) The victim of the offense induced or facilitated it. (2) It is unlikely that the offense would have been committed but for the fact that the offender was under duress, coercion or strong provocation. (3) The offense was primarily the product of the offender's psychosis or mental deficiency . . . ." Holding that the Ohio statute was unconstitutional in that it limited consideration of mitigating factors, the Supreme Court in an opinion delivered by Chief Justice Burger, in part, stated:

> We are now faced with those questions and we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . .

> \*    \*    \*

> The limited range of mitigating circumstances which may be considered by the sentencer under the Ohio statute is incompatible with the Eighth and Fourteenth Amendments. To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors.

We note that *Lockett* and our older North Carolina cases are in accord in holding that the matters which cannot be excluded are *relevant* mitigating factors, *i.e.,* any aspect of defendant's character or record and any circumstances of the charged offense offered by a defendant in mitigation. Although there was no attack upon the constitutionality of the North Carolina statute, under this assignment of error, we note that our statute is not as limited or restrictive as was the Ohio statute considered in *Lockett.*

We hold that this patently irrelevant evidence was correctly excluded by the trial judge.

Defendant assigns as error the failure of the trial judge to set aside the jury's sentencing recommendation on the ground that the jurors considered matters dehors the record in reaching their recommendation.

After the jury had returned its recommendation that defendant's punishment be death, defense counsel moved that the recommendation be set aside. In support of his motion, he offered the testimony of Marilyn Mather, a reporter for the Charlotte Observer, to the effect that on the day after the trial she spoke with Mrs. Ralph Emery who was one of the jurors who returned the sentencing recommendation and that Mrs. Emery stated to the witness that, "The main reason that they voted for death was because they were all aware that if they voted for life, John Cherry would be eligible for parole in 20 years." The witness further testified that the jurors were aware of this because of another first degree case entitled *State v. James Allen Connors*, which was being tried the same week in the same courthouse and in which the defendant received a life sentence. The witness also stated that she had written stories about the *Connors* case in which it was related that Connors would be eligible for parole in twenty years and that Mrs. Emery had told her that all of the jurors were well aware of the *Connors* case.

The record further reflects that the Assistant Public Defender indicated to the trial judge that he would like to subpoena all the jurors and question them individually as to whether they considered any matters which were not included in the court's charge. The trial judge refused to permit such testimony. In denying defendant's motion, the court specifically declined to hear from any juror concerning the subject matter referred to in defendant's motion.

[3] It is well settled in North Carolina that after a verdict has been rendered and received by the court, and jurors have been discharged, jurors will not be allowed to attack or overthrow their verdict, nor will evidence from them be received for such purpose. *Selph v. Selph*, 267 N.C. 635, 148 S.E. 2d 574 (1966); *State v. Hollingsworth*, 263 N.C. 158, 139 S.E. 2d 235 (1964); *In re Will of Hall*, 252 N.C. 70, 113 S.E. 2d 1 (1960). This rule cannot be circumvented by the testimony of another as to what the juror has said. *Lambert v. Caronna*, 206 N.C. 616, 175 S.E. 303 (1934); *Baker v. Winslow*, 184 N.C. 1, 113 S.E. 570 (1922).

This Court has held that a juror cannot impeach his verdict by stating the *reasons* upon which the verdict was reached. *See, State v. Royal*, 90 N.C. 755 (1884). In *State v. Brittain*, 89 N.C. 481

(1883), a juror was not allowed to impeach his verdict because the deputy sheriff in charge of the jury made a statement in the presence of some of the jurors that, "The prisoner's counsel has about given up this case, and there was a good deal of anxiety about the case."

In *State v. Hollingsworth, supra,* the Court stated the rationale of this rule in the following quotation:

In *McDonald v. Pless and Winbourne,* 238 U.S. 264, 59 L.Ed. 1300, the Court held that jurors may not, in the Federal courts, impeach their own verdict by testimony that it was a quotient verdict. In its opinion the Court said:

"[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference."

[4]   We recognize that a defendant's eligibility for parole is not a proper matter for consideration by the jury. *See, State v. McMorris,* 290 N.C. 286, 225 S.E. 2d 553 (1976). Nevertheless, a possibility that such knowledge might have been possessed by jurors will not permit a juror to attack and impeach his own verdict after it has been received by the court. This is particularly so in instant case in view of the fact that there was neither argument by the State nor instructions by the court on the question of parole eligibility. Further, we see little prejudice to defendant since the possibility of parole or executive clemency is a matter of common knowledge among most adult persons.

[5]   Defendant, however, argues that G.S. 15A-1240, effective 1 July 1978, mandated the reception of this evidence. G.S. 15A-1240 provides:

*Impeachment of the verdict.* — (a) Upon an inquiry into the validity of a verdict, no evidence may be received to show the effect of any statement, conduct, event, or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined.

(b) The limitations in subsection (a) do not bar evidence concerning whether the verdict was reached by lot.

(c) After the jury has dispersed, the testimony of a juror may be received to impeach the verdict of the jury on which he served, subject to the limitations in subsection (a), only when it concerns:

> (1) Matters not in evidence which came to the attention of one or more jurors under circumstances which would violate the defendant's constitutional right to confront the witnesses against him; or

> (2) Bribery, intimidation, or attempted bribery or intimidation of a juror.

In our opinion, subsection (a) of this statute amounts to legislative recognition of the existing case law. Defendant's reliance, therefore, must be upon subsection (c)(1) of the statute. This reliance is misplaced. A juror's knowledge that there is a possibility of parole for a defendant would not "violate the defendant's constitutional right to confront the witnesses against him."

For reasons stated, this assignment of error is overruled.

[6] Defendant assigns as error the court's ruling which precluded him from offering proof that the district attorney abused his discretion in the calendaring of cases. It is defendant's position that his offered proof would have supported his contention that the North Carolina death penalty statute is unconstitutional in that it denies a defendant due process by permitting the district attorney to "calendar cases when he chooses, in front of whatever judge he chooses." We disagree.

It is the district attorney's statutory duty to prepare the trial docket and prosecute criminal actions in the name of the State. G.S. 7A-61. In order to properly perform this duty, he must exercise selectivity in preparing the trial calendar.

Our courts have recognized that there may be selectivity in prosecutions and that the exercise of this prosecutorial prerogative does not reach constitutional proportion unless there be a showing that the selection was deliberately based upon "an unjustifiable standard such as race, religion or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 7 L.Ed. 2d 446, 82 S.Ct. 501 (1962). *See also, State v. Woodson*, 287 N.C. 578, 215 S.E. 2d 607 (1975), *rev'd on other grounds*, 428 U.S. 280. Here there is no allegation or even intimation that the district attorney had deliberately employed any "unjustifiable standard" in calendaring this or any other case involving the death penalty. Further, we note that defendant's proposed offer of proof did not purport to contain any evidence relative to any cases involving the death penalty. Even so, assuming arguendo, that the district attorney had exercised unbridled discretion in setting cases before judges of his choice, we cannot perceive how such action would be relevant to the constitutionality of the death penalty. Under Article 100 of Chapter 15A of the General Statutes of North Carolina, the jury has the sentencing power and the trial judge is bound by the jury's sentence recommendation.

[7] Defendant contends that jurors were erroneously excused from the guilt-innocence phase of the trial for cause because of their views on capital punishment. On voir dire, twenty-one jurors were excused by the court for cause because of their beliefs concerning capital punishment. The questions propounded by the district attorney and the answers given by prospective juror Parker are representative of the questions and answers propounded and answered by all jurors who were successfully challenged for cause because of their views concerning capital punishment. The pertinent portions of the voir dire of Mr. Parker are as follows:

Q. Mr. Parker, if I might, please, sir, let me ask the questions that I have asked, or at least some of the questions that I have asked the other members. Mr. Parker, I take it from your answer and the way that you gave it, that you would not vote, and could not ever, vote to impose the death penalty, is that a fair statement?

MR. PARKER: That's right, sir.

---

---

Q. May I also take it as true that you would refuse to even consider its imposition in this case?

MR. PARKER: That's right.

Q. And finally, may I take it as true, sir, that you would automatically vote against the imposition of the death penalty in this case, without regard to any evidence that might be developed in this trial?

MR. PARKER: That's right, sir.

Q. Thank you, Mr. Parker. Your Honor, we would tender Mr. Parker for cause.

MR. MERCER: OBJECT and ask the Court to instruct the prospective juror as to what his responsibilities are in the terms of the life or death matter.

COURT: Show the motion denied. Objection overruled. Note the exception. Stand aside.

In the landmark case of *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968), jurors were excluded who voiced general objection to capital punishment or expressed religious or conscientious scruples against imposition of the death penalty. In finding error, the United States Supreme Court stated:

. . . [W]e hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected. [391 U.S. 510, 522-523.]

Footnote 21 of *Witherspoon* contained, inter alia, the following language:

. . . The most that can be demanded of a venireman in this regard is that he be willing to CONSIDER [emphasis is the Court's] all of the penalties provided by state law, and that HE NOT BE IRREVOCABLY COMMITTED, BEFORE THE TRIAL HAS BEGUN, TO VOTE AGAINST THE PENALTY OF DEATH REGARDLESS OF THE FACTS AND CIRCUMSTANCES THAT MIGHT EMERGE IN

THE COURSE OF THE PROCEEDINGS. [Emphasis added]. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion. See nn. 5 and 9, *supra*.

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would AUTOMATICALLY vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's GUILT. Nor does the decision in this case affect the validity of any sentence OTHER than one of death. Nor, finally, does today's holding render invalid the CONVICTION, as opposed to the SENTENCE, in this or any other case. [391 U.S. 510, 522-523.]

*See also, State v. Britt*, 288 N.C. 699, 220 S.E. 2d 283 (1975); *State v. Ward*, 286 N.C. 304, 210 S.E. 2d 407 (1974), *death sentence vacated*, 428 U.S. 903; *State v. Jarrette*, 284 N.C. 625, 202 S.E. 2d 721 (1974), *death sentence vacated*, 428 U.S. 903.

In instant case, the successfully challenged jurors indicated that they could not recommend the imposition of the death penalty under any circumstances and that they would automatically vote against the imposition of the death penalty without regard to the evidence that might be developed at the trial. Thus, the trial judge correctly allowed the challenges for cause. Nevertheless, defendant argues that the beliefs of the jurors concerning capital punishment have no place in the innocence-guilt phase of the bifurcated trial pursuant to Article 100 of Chapter 15A of the General Statutes of North Carolina. Defendant's position in this regard is that a bifurcated trial pursuant to Article 100 of Chapter 15A should be abolished and the two phases of the trial should be heard by two separate and distinct juries. We do not agree. The United States Supreme Court has approved the bifurcated trial procedure in which the same jurors heard both phases

of the trial. *Gregg v. Georgia,* 428 U.S. 153, 49 L.Ed. 2d 859, 96 S.Ct. 2909 (1976); *Jurek v. Texas,* 428 U.S. 262, 49 L.Ed. 2d 929, 96 S.Ct. 2950 (1976). Further, in *Witherspoon* the Court expressly noted that there was no error in exclusion for cause of jurors who made it clear that their attitudes toward the death penalty would prevent them from making an impartial decision as to defendant's *guilt.*

Under Article 100 of Chapter 15A of the General Statutes of North Carolina, it is contemplated that the same jury shall hear both phases of the trial unless the original jury is "unable to reconvene." G.S. 15A-2000(2). We are, therefore, of the opinion that the trial judge acted pursuant to the mandate of the statute and within the rationale of *Witherspoon.*

Defendant's argument that the exclusion of jurors for cause because of their beliefs concerning capital punishment resulted in his being tried by a prosecution prone jury is without merit. This contention was answered adversely to defendant in *Witherspoon* when the Court concluded:

. . . We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. [*Id.* at 517-518.]

We hold that the trial judge properly excused the jurors for cause because of their views concerning capital punishment.

[8] Defendant contends that he was denied his right to counsel at a crucial stage of the proceedings because his counsel was not permitted to be present when an Assistant District Attorney talked with State's witnesses prior to a lineup procedure.

In *State v. Waddell,* 289 N.C. 19, 220 S.E. 2d 293 (1975), *death sentence vacated,* 428 U.S. 904, we reviewed certain recognized rules of law pertinent to decision of this assignment of error, to wit:

It is well settled that lineup procedures which are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" violate due process and are constitutionally unacceptable. *Simmons v.*

.

*United States*, 390 U.S. 377, 19 L.Ed. 2d 1247, 88 S.Ct. 967; *State v. Smith*, 278 N.C. 476, 180 S.E. 2d 7; *State v. Austin*, 276 N.C. 391, 172 S.E. 2d 507. It is also established by decisions of this Court and the federal courts that an accused must be warned of his right to counsel during such confrontation and unless presence of counsel is understandingly waived testimony concerning the lineup must be excluded in absence of counsel's attendance. Further, if there be objection to an in-court identification by a witness who participated in an illegal lineup procedure, such evidence must be excluded unless it be determined on *voir dire* that the in-court identification is of independent origin and therefore not tainted by the illegal lineup. *Gilbert v. California*, 388 U.S. 263, 18 L.Ed. 2d 1178, 87 S.Ct. 1951; *United States v. Wade*, 388 U.S. 218, 18 L.Ed. 2d 1149, 87 S.Ct. 1926; *State v. Smith*, *supra*.

In the landmark cases of *United States v. Wade*, 388 U.S. 218, 18 L.Ed. 2d 1149, 87 S.Ct. 1926 (1967), and *Gilbert v. California*, 388 U.S. 263, 18 L.Ed. 2d 1178, 87 S.Ct. 1951 (1967), the United States Supreme Court formulated the rule that the right to counsel arises where there is a pretrial *confrontation* in a trial-like atmosphere with the State aligned against the accused. The Federal decisions which have followed *Gilbert* and *Wade* clarify the scope of those decisions.

The Fourth Circuit Court of Appeals held in *United States v. Wilcox*, 507 F. 2d 364 (4th Cir. 1974), *cert. denied*, 420 U.S. 979, that an accused's rights under the sixth amendment were not violated because his counsel was excluded from a conference between the prosecutor and State's witnesses after a pretrial lineup, reasoning that the sixth amendment right to counsel applies only to personal confrontations between the State and the accused.

In *United States v. Cunningham*, 423 F. 2d 1269 (4th Cir. 1970), the Fourth Circuit Court of Appeals in rejecting defendant's claim that he was denied his constitutional right to counsel because a State's witness was interrogated in absence of the defendant's counsel stated:

While *Wade* and *Gilbert* both hold that under the Sixth Amendment an accused is entitled to the aid of counsel at

the lineup, we cannot read the scope of the holding to extend beyond the actual confrontation between the accused and the victim or witnesses to a crime from whom identification evidence is sought to be elicited. . . .

. . . It is not claimed that to date the Supreme Court has required the presence of counsel during the interrogation of all witnesses, and we will not so require with regard to the interrogation of identification witnesses once the actual confrontation has been completed.

*See also, United States v. Bennett,* 409 F. 2d 888 (2d Cir. 1969), *cert. denied,* 396 U.S. 852; 402 U.S. 984; *United States v. Ash,* 413 U.S. 300, 37 L.Ed. 2d 619, 93 S.Ct. 2568 (1973).

Furthermore, assuming, arguendo, that there was a violation of defendant's sixth amendment rights because his counsel was excluded from the interrogation or conference between the prosecution and the State's witnesses, such error would be harmless error beyond a reasonable doubt since defendant does not contend that there was any impermissible suggestiveness in the lineup procedure. *See, Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967). *Gilbert v. California, supra,* recognized the possibility of harmless constitutional error in the admission of lineup testimony. *Accord: United States v. Cunningham, supra.*

We hold that defendant was not denied his constitutional right to counsel at a crucial stage of the proceedings.

**[9]** Defendant next contends that the trial court erred in allowing into evidence testimony of other crimes allegedly attempted or committed by defendant on the same day as the murder for which he was convicted. The testimony to which defendant objects concerned statements he made to two of the State's witnesses that he planned to rob and sexually assault the employee of a Jiffy Mart but was unable to do so because there were people nearby; that he planned to rob a washerette but did not because it was too crowded; that he had robbed the Frito Lay delivery man earlier that day; and that he bought some heroin and cocaine with which he and the two witnesses "shot up." The Frito Lay delivery man testified that he had, in fact, been robbed on the day in question but he was unable to identify defendant as

the man who robbed him. Defendant argues that this evidence was irrelevant and highly prejudicial.

It is well settled in North Carolina that the State cannot offer evidence of other crimes committed by the defendant where the only relevancy of such evidence is its tendency to show the defendant's disposition to commit a crime of the nature of the one for which he is on trial. *State v. Shrader*, 290 N.C. 253, 225 S.E. 2d 522 (1976); *State v. Carey*, 288 N.C. 254, 218 S.E. 2d 387 (1975), *death sentence vacated*, 428 U.S. 904; *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954). If such evidence tends to prove any other relevant fact, however, it will not be excluded merely because it also shows defendant to have been guilty of an independent crime. *State v. Carey, supra; State v. McClain, supra.* Where evidence tends to prove a motive on the defendant's part to commit the crime charged, it is admissible even though it discloses the commission of another offense by the defendant. *State v. McClain, supra.* Moreover, it is competent to show the motive for the commission of a crime even though motive does not constitute an element of the offense charged. *See, State v. Adams*, 245 N.C. 344, 95 S.E. 2d 902 (1957); *State v. Coffey*, 228 N.C. 119, 44 S.E. 2d 886 (1947).

Applying these rules to instant case, we think it is clear that the evidence objected to was admissible. The record shows that defendant was a regular drug user. It further shows that on the day in question, defendant, having neither drugs nor money with which to obtain them, was determined to get some money, with which to buy drugs. According to his statement to one of the witnesses, he robbed the Frito Lay delivery man and used the money to buy heroin and cocaine. Thereafter, he killed Eugene Howard during the robbery at Tony's Jiffy Market. With the money thus obtained, he bought more heroin and cocaine with which he "shot up" that night. We think the evidence leaves no doubt that defendant was motivated by a desire to obtain money, by robbery if necessary, in order to buy and use drugs. The challenged evidence was, therefore, admissible to show defendant's motive. This assignment of error is overruled.

By his last assignment of error, defendant challenges the constitutionality of our capital punishment procedure. We do not deem it necessary to address the constitutional questions raised

for reasons which will be discussed below. We do think it appropriate, however, to summarize the sentencing procedure, established by G.S. 15A-2000, to be followed in capital cases.

Upon a defendant's plea of not guilty in a first-degree murder case, the issue of guilt-innocence is determined by a jury during the first phase of the bifurcated trial. If the jury returns a verdict of guilty, the second phase of the trial, a sentencing proceeding, is conducted in order for the same jury to determine whether the defendant should be sentenced to death or life imprisonment. During the sentencing phase of the trial, the jury may consider any evidence which was introduced at the guilt determination phase as well as any new evidence which the court deems relevant to sentence or to have probative value. The statute requires the trial judge to instruct the jury on any of ten aggravating circumstances and eight mitigating circumstances, specified in the statute, which may be supported by the evidence. In addition to the mitigating circumstances specified, the jury may consider any other circumstance arising from the evidence which it deems to have mitigating value.

After hearing the evidence, argument of counsel, and instructions of the court, the jury after deliberation recommends to the court the sentence to be imposed based upon (1) whether any sufficient aggravating circumstance or circumstances exist; (2) whether any sufficient mitigating circumstance or circumstances which outweigh the aggravating circumstance(s) found, exist; and (3) whether, based on these considerations the defendant should be sentenced to death or life imprisonment. A sentence recommendation of death must be agreed upon by a unanimous vote of the twelve jurors. In such case, the jury must show in writing: (1) the statutory aggravating circumstance or circumstances it finds beyond a reasonable doubt; (2) that the aggravating circumstance or circumstances found by the jury are sufficiently substantial to call for the imposition of the death penalty; and (3) that the mitigating circumstance or circumstances are insufficient to outweigh the aggravating circumstance or circumstances found. The jury's sentence recommendation is binding upon the trial judge.

A judgment of conviction and sentence of death are subject to automatic review by this Court for consideration of the penalty

State v. Cherry

imposed as well as any errors assigned on appeal. The sentence of death shall be overturned and a sentence of life imprisonment imposed in its stead upon a finding by the Supreme Court that: (1) the record does not support the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death; or (2) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; or (3) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

If judgment and sentence of death are reversed for error in the sentencing phase of the trial, we are required to remand for a new sentencing hearing, to be conducted pursuant to the same provisions as the original sentencing hearing.

In instant case, the trial judge submitted five aggravating circumstances to the jury which it answered as follows:

1. Has the defendant been previously convicted of a felony involving the use or threat of violence to the person? Yes.

2. Was the murder committed while the defendant was engaged in the commission of robbery with a firearm? Yes.

3. Was the murder committed for pecuniary gain? Yes.

4. Was the murder especially heinous, atrocious, or cruel? No.

5. Did the defendant knowingly create a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person? No.

The jury thereupon made the following sentence recommendation:

Based upon those answers to the issues submitted as found from the evidence in the case and the law given by the Court, the jury unanimously determines that the aggravating circumstances found by the jury beyond a reasonable doubt are sufficiently substantial to call for the imposition of the death penalty; that the mitigating circumstances are insuffi-

cient to outweigh the aggravating circumstances found and therefore recommends that punishment of the defendant shall be death.

The crucial problem which we perceive in this case concerning the aggravating circumstances submitted to the jury was not raised by defendant. Defendant was convicted under the felony murder rule. The trial judge did not mention premeditation and deliberation in his jury instructions.

G.S. 14-17 clearly states that a murder which is committed in the perpetration or attempted perpetration of any robbery, rape, arson, kidnapping, burglary or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree and shall be punishable by death or life imprisonment pursuant to the provisions of G.S. 15A-2000. Thus, the Legislature has left no doubt that the death penalty is available upon a felony murder conviction. One of the aggravating circumstances which may be considered by the jury is found in G.S. 15A-2000(e)(5), which provides:

The capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.

Clearly, this circumstance would be supported by the evidence in a felony murder conviction since the felony murder, by definition, must have occurred during the commission or attempted commission of one of the enumerated felonies. The problem here presented arises because this circumstance is inherent in, and a necessary element of, the capital felony, to wit, felony murder.

No element of a first degree murder which is committed with premeditation and deliberation is included in the list of aggravating circumstances found in G.S. 15A-2000(e). A defendant convicted of a felony murder, nothing else appearing, will have one aggravating circumstance "pending" for no other reason than the nature of the conviction. On the other hand, a defendant convicted of a premeditated and deliberated killing, nothing else appearing, enters the sentencing phase with no strikes against

him. This is highly incongruous, particularly in light of the fact that the felony murder may have been unintentional, whereas, a premeditated murder is, by definition, intentional and preconceived.

It is well settled in this jurisdiction that when the State, in the trial of a charge of murder, uses evidence that the murder occurred in the perpetration of another felony so as to establish that the murder was murder in the first degree, the underlying felony becomes a part of the murder charge to the extent of preventing a further prosecution of the defendant for, or a further sentence of the defendant for, commission of the underlying felony. *State v. Squire*, 292 N.C. 494, 234 S.E. 2d 563 (1977), *cert. denied*, 434 U.S. 998; *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972). Although designed to prevent double jeopardy, a problem with which we are not here confronted, we think the merger rule sheds light on the question before us. Once the underlying felony has been used to obtain a conviction of first degree murder, it has become an element of that crime and may not thereafter be the basis for additional prosecution or sentence. Neither do we think the underlying felony should be submitted to the jury as an aggravating circumstance in the sentencing phase when it was the basis for, and an element of, a capital felony conviction.

[10] We are of the opinion that, nothing else appearing, the possibility that a defendant convicted of a felony murder will be sentenced to death is disproportionately higher than the possibility that a defendant convicted of a premeditated killing will be sentenced to death due to the "automatic" aggravating circumstance dealing with the underlying felony. To obviate this flaw in the statute, we hold that when a defendant is convicted of first degree murder under the felony murder rule, the trial judge shall not submit to the jury at the sentencing phase of the trial the aggravating circumstance concerning the underlying felony.

Nothing we have said herein should be construed to foreclose consideration of the aggravating circumstance found in G.S. 15A-2000(e)(5) when a murder occurred during the commission of one of the enumerated felonies but where the defendant was convicted of first degree murder on the basis of his premeditation and deliberation. In such case, the jury should properly consider that aggravating circumstance in determining sentence.

In instant case, the jury found as an aggravating circumstance that the murder was committed while defendant was engaged in the commission of robbery with a firearm. As a result of our decision precluding consideration of the underlying felony as an aggravating circumstance, we are of the opinion that the trial judge erred in submitting that circumstance to the jury.

We must now determine whether submission of that aggravating circumstance requires a new sentencing proceeding.

G.S. 15A-2000 provides that the jury's sentence recommendation is binding on the trial judge. If the jury recommends a sentence of death, it must show in writing:

(1) The statutory aggravating circumstance or circumstances which the jury finds beyond a reasonable doubt; and

(2) That the statutory aggravating circumstance or circumstances found by the jury are sufficiently substantial to call for the imposition of the death penalty; and

(3) That the mitigating circumstance or circumstances are insufficient to outweigh the aggravating circumstance or circumstances found.

We are unable to say that under the circumstances of this particular case the trial judge's submission of the issue concerning the underlying felony constituted harmless error. Had the jury not considered the underlying felony as an aggravating circumstance, it may well have decided that the remaining aggravating circumstances were not sufficiently substantial to call for imposition of the death penalty.

For error in the sentencing phase of the trial, this case is remanded for a new sentencing hearing pursuant to G.S. 15A-2000(d)(3).

In the guilt determination phase of the trial, no error.

In the sentencing phase of the trial, new trial.

Justice BROCK did not participate in the consideration or decision of this case.

Justice HUSKINS concurring.

I support the majority opinion in *Cherry, Goodman* and *Johnson*. At the same time, I join in the concurring opinion of Justice Carlton which correctly, I think, analyzes the results reached in these three cases.

Justice CARLTON concurs for the reasons stated in his concurring opinion filed this date in *State v. Goodman*, 298 N.C. 1, 36, 257 S.E. 2d 569, 591 (1979).